Turner, J.
 

 We have before us for decision two questions:
 

 1. Whether the trial court had jurisdiction of this action under Section 16(b) of the Fair Labor Standards Act of 1938 (Title 29, Section 216[b], U. S. Code).
 

 2. Whether, under Section 7 of such act, appellee is entitled to compensation for overtime, and if so whether the amount of compensation and of liquidated damages was correctly computed.
 

 The jurisdictional question depends upon whether Section 16(b) is penal.
 

 Section 256 of the Judicial Code (Title 28, Section 371, U. S. Code) provides
 

 “The jurisdiction vested in the courts of the United States in the cases and proceedings hereinafter mentioned, shall be exclusive of the courts of the several states: * * * Of all suits for penalties and forfeitures incurred under the laws of the United States.”
 

 In addition to Section 256 of the Judicial Code, it is an accepted principle of law that courts of one jurisdiction will not enforce the penal laws of another jurisdiction.
 
 The Antelope,
 
 23 U. S. (10 Wheat.), 66, 123, 6 L. Ed., 268; Dicey & Keith, Conflict of Laws (3 Ed.), 230; 2 Beale, Conflict of Laws, 1339, Section 421.1; 32 Ohio Jurisprudence, 215, Section 10;
 
 State of Indiana, for the Use of Gone,
 
 v.
 
 John,
 
 5 Ohio, 217.
 

 Therefore, the Congress may not confer jurisdiction upon the courts of this state for the recovery of penalties even though called by some other name.
 

 The test whether a law is penal is whether the wrong sought to be redressed is a wrong to the public or a
 
 *523
 
 wrong to the individual.
 
 Huntington
 
 v.
 
 Attrill,
 
 146 U. S., 657, 36 L. Ed., 1123, 13 S. Ct., 224.
 

 A law is not penal merely because it imposes an extraordinary liability on a wrongdoer in favor of a person wronged, which is not limited to the damages suffered by him. Dicey & Keith, Conflict of Laws (3 Ed.), 231;
 
 Meeker
 
 v.
 
 Lehigh Valley Rd. Co.,
 
 236 U. S., 412, 59 L. Ed., 644, 35 S. Ct., 328;
 
 Cox
 
 v.
 
 Lyke Bros.,
 
 237 N. Y., 376, 143 N. E., 226.
 

 Section 16 of the Pair Labor Standards Act of 1938, under the heading of “Penalties,” provides under paragraph (a) for fine and imprisonment for the wilful violation of Section 15 of the act. Paragraph (b) of Section 16 provides:
 

 “Any employer who violates the provisions of Section 6 or Section 7 of this act shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Action to recover such liability may be maintained in any court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated, or such employee or employees may designate an agent or representative to maintain such action for and in behalf of all employees similarly situated. The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney’s fee to be paid by the defendant, and costs of the action.”
 

 In the case of
 
 Robertson
 
 v.
 
 Argus Hosiery Mills, Inc.,
 
 121 F. (2d), 285, Circuit Court of Appeals Judge Allen said, at page 286:
 

 “The Pair Labor Standards Act * * * describes the additional equal amount for which the employer shall be liable as ‘liquidated damages. ’ Under familiar principles of law the conception of penalty is thus ex-
 
 *524
 
 eluded from the provision. We see no reason for delving beneath this unequivocal term in order to spell out a meaning at variance with the intent expressed.”
 

 While a court of equity will determine whether an amount denominated liquidated damages in a private contract is in fact a penalty, such interpretation is not permissible where the legislative body has provided that a prescribed or ascertained amount shall be considered liquidated damages to be recovered by a private person.
 

 We are of the opinion that Section 16(b),
 
 supra,
 
 does not provide for such a penalty as is contemplated by Section 256 of the Judicial Code or as the term “penal” is used in the conflict of laws.
 

 In the case of
 
 Claflin
 
 v.
 
 Houseman,
 
 93 U. S., 130, 136, 23 L. Ed., 833, 838, Mr. Justice Bradley said: “The general principle being, that, where jurisdiction may be conferred on the United States courts, it may be made exclusive where not so by the Constitution
 
 itself;
 
 but if exclusive jurisdiction be neither expressed nor implied, the state courts have concurrent jurisdiction whenever by their own constitution they are competent to take it.”
 

 In the case of
 
 Missouri, ex rel. St. L., B. & M. Ry. Co.,
 
 v.
 
 Taylor, Judge,
 
 266 U. S., 200, 69 L. Ed., 247, 45 S. Ct., 47, Mr. Justice Brandeis said, at page 208:
 

 “The federal right is enforcible in a state court whenever its ordinary jurisdiction as prescribed by local laws is appropriate to the occasion and is invoked in conformity with those laws.”
 

 In the case of
 
 Hade, Recr.,
 
 v.
 
 McVay, Allison & Co.,
 
 31 Ohio St., 231, it was held:
 

 “The action authorized by Section 30 of the National Banking Act of 1864,. to recover from the bank twice the amount of usurious interest paid, was within the jurisdiction of the state courts.”
 

 In 11 Ohio Jurisprudence, 739, Section 93, it is said:
 

 
 *525
 
 “Eights, whether legal or equitable, acquired under the laws of the United States, may be prosecuted in the United States courts or in the state courts competent to decide rights of like character and class; subject, however, to this qualification, that where a right arises under a law of the United States, Congress may, if it sees fit, give to the federal courts exclusive jurisdiction. ’ ’
 

 In the case of
 
 Adair
 
 v.
 
 Traco Division,
 
 192 Ga., 59, 14 S. E. (2d), 466, it was held:
 

 “Jurisdiction of a suit by an employee to recover unpaid minimum wages and overtime compensation, and an additional equal amount as ‘liquidated damages,’ and attorney’s fees, under the Fair Labor Standards Act of 1938 (Title 29, Section 216, U. S. Code), is not vested exclusively in the courts of the United States, but may be heard and determined in any state court of competent jurisdiction.”
 

 We, therefore, hold that the trial court had jurisdiction in the instant case.
 

 The remaining question depends upon an interpretation of Sections 6 and 7 of the act.
 

 Section 6, so far as material, provides:
 

 “(a) Every employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce wages at the following rates—
 

 “ (1) during the first year from the effective date of this section, not less than 25 cents an hour.
 

 “(2) during the next six years from such date, not less than 30 cents an hour, * *
 

 Section 7, so far as material, provides:
 

 “(a) No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce—
 

 “(1) for a workweek longer than forty-four hours
 
 *526
 
 during the first year from the effective date of this section,
 

 “(2) for a workweek longer than forty-two hours during the second year from such date, or
 

 “(3) for a workweek longer than forty hours after the expiration of the second year from such date, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.”
 

 It will be observed that Section 6 provides for minimum wages, while Section 7 provides for maximum hours at the regular rate, but does not forbid any amount of overtime.
 

 The Supreme Court of the United States in the cases of
 
 United States
 
 v.
 
 Darby,
 
 312 U. S., 100, 85 L. Ed., 609, 61 S. Ct., 451, and
 
 Opp Cotton Mills, Inc.,
 
 v.
 
 Administrator,
 
 312 U. S., 126, 85 L. Ed., 624, 61 S. Ct., 524, has held valid some of the essential features of the law, which have long been recognized as within the province of the Congress under the commerce clause, but has not yet passed upon the exact question we have here. That court now has before it the case of
 
 Fleming
 
 v.
 
 Belo Corp.,
 
 decided by the Circuit Court of Appeals, Fifth Circuit (121 F. [2d], 207). The decision of that case would be very helpful, though not necessarily decisive here.
 

 In the
 
 Darby case,
 
 the District Court had declared that manufacturing is not interstate commerce and that the regulation by the Fair Labor Standards Act of wages and hours of employment of those engaged in the manufacture of goods which it is intended at the time of production “may or will be” after production sold in interstate commerce in part or in whole is not within the congressional power to regulate commerce. Bearing in mind that the only question before the Supreme Court in the
 
 Darby case
 
 was the right to pro
 
 *527
 
 Mbit shipment of proscribed goods in interstate commerce and to punish for the violation thereof, Mr. Justice Stone (now Mr. Chief Justice Stone) said, at page 113 (L. Ed., page 616):
 

 “While manufacture is not of itself interstate commerce, the shipment of manufactured goods interstate is such commerce and the prohibition of such shipment by Congress is indubitably a regulation of the commerce.”
 

 It will be seen that while the question of whether the provisions of Sections 6 and 7 are valid so far as they apply to the
 
 production of goods
 
 for commerce has been settled both as to the right of the Congress to prohibit the interstate shipment of goods so manufactured and to punish for the violation of such prohibition, it does not necessarily follow that the cause of action created by Section 16(b) in favor of the employee against the employer will be upheld. This question not having been raised here, we shall not attempt to pass upon it.
 

 While appellant does not claim that the law is not applicable, it does claim that it has not violated the law and that it owes appellee nothing.
 

 Appellant presents what seems to us a commonsense argument that it has paid to appellee all that was or could be due under the law. Appellee and the lower courts relied upon paragraphs 5, 6, 7 and 12 of Interpretative Bulletin No.
 
 4
 
 (November 1940 Bevision)' issued by the administrator for the interpretation of the law and the computation of the amount found due. This we hold was error.
 

 While weight is always given to administrative interpretation of ambiguous statutes, we feel that where there is no long-established practice following such administrative interpretation, such interpretation should have no more weight than a brief upon the subject.
 

 
 *528
 
 The records in this case show that, when the Fair Labor Standards Act became effective, “plaintiff [appellee] was so employed by defendant 78 honrs per week at the rate of $31 per week, and continued working in such capacity 78 hours each and every workweek until January 5, 1940, receiving therefor $31 per week until January 8,1939, and $33 per week from the latter date to January 5, 1940.”
 

 The total minimum pay required by the act for a 78-hour week during the first year from the effective date of the act would amount to $23.75, computed as follows: 25 cents per hour for the first 44 hours, which would amount to $11, and time and one-half, that is, 37% cents per hour, for the 34 hours of overtime, which would amount to $12.75.
 

 As appellant paid appellee $31 per week for the 78-hour week until January 8, 1939, and thereafter at the rate of $33 per week until appellee left appellant’s employment, there is nothing due. Appellee claims that under the interpretation in Labor Department’s Interpretative Bulletin No. 4 the regular hourly rate of pay, if the employee is on a weekly salary basis, is computed by dividing the salary by the regular number of hours. This formula is proper when the regular hours are not more than the maximum provided. Where, however, the regular number of hours
 
 contracted
 
 for are more than the maximum, such formula automatically results in a deficiency against the employer no matter how high the salary or wages he pays and results in the impairment of the obligations of the contract between employer and employee.
 

 In the present case when appellee’s salary was raised $2 per week by the employer, it created a greater deficiency against the employer than when the salary was $31 per week.
 

 The master and servant relation is one of contract. We find nothing in the statute to prevent employer and
 
 *529
 
 employees from contracting with each other for a weekly wage for hours that may exceed the so-called maximum of Section
 
 7,
 
 so long as the weekly wage when divided hy the hours worked is not below the minimum fixed by the statute together with the time and one-half for the hours that amount to overtime under Section 7.
 

 This is in line with the view taken by both the District Court and the Circuit Court of Appeals, Fifth Circuit, in the case of
 
 Fleming
 
 v.
 
 Belo Corp.,
 
 121 F. (2d), 207.
 

 However, our holding here is contrary to the holdings in the cases of
 
 Bumpus
 
 v.
 
 Continental Baking Co.,
 
 124 F. (2d), 549, by the Sixth Circuit Court of Appeals, and
 
 Carleton Screw Products Co.
 
 v.
 
 Fleming,
 
 ... F. (2d), ..., 5 Wage & Hour Rep., 238, decided March 20, 1942, by the Eighth Circuit Court of Appeals.
 

 The difference in results between the
 
 Belo case
 
 on the one hand, and the
 
 Bumpus
 
 and
 
 Carleton cases
 
 on the other, is due to the difference in approach.
 

 In the
 
 Belo case,
 
 the court felt bound to discover the purpose of the law within the four corners of the act— confining themselves to determining what the Congress meant by what it said. In the
 
 Bumpus case,
 
 the Circuit Court of Appeals reversed the District Court because that court’s decision was contrary to the “legislative history and background.” The court relied on the President’s message, the various committee hearings and reports, the discussion on the floor of both houses of Congress and the interpretative bulletin of the administrator. In the
 
 Carleton case,
 
 the court relied upon and quoted extensively from the
 
 B%impu,s case.
 

 In the
 
 Belo case,
 
 the court took the position that the purpose of the act is to establish and gradually raise minimum wages, and that the provisions for overtime compensation were inserted, not to discourage and limit overtime work, but as a part of a scheme to raise sub
 
 *530
 
 standard wages by providing definite pay for overtime when such work is required.
 

 In the
 
 Bumpus case,
 
 after considering the legislative history and background, the court said: “* * * it suffices to say that these statements strongly support the construction that Section 7 of the statute is not merely a part of a statutory plan to raise substandard wages.” The court paid no attention to the right to contract.
 

 In both the
 
 Bumpus
 
 and
 
 Carleton cases,
 
 the courts held that the purpose of Section 7 was to punish or penalize the employer for providing overtime work.
 

 Furnishing employment in a safe and sanitary place to work has never been held in this state to be either illegal or immoral. This nation was built on and by industry. Heretofore, it has been the policy of the law, both state and national, to correct all oppressive labor conditions, but otherwise to allow the freedom of contract guaranteed by the Constitution. While the court in the
 
 Bumpus case
 
 paid no attention to the right to contract, in the
 
 Carleton case
 
 the court held that the act as interpreted was not an unreasonable restraint upon the liberty of contract.
 

 In the
 
 Carleton case,
 
 the court said:
 

 “The liberty of contract guaranteed by the Constitution is not an absolute one, but is a freedom from arbitrary restraint, rather than an immunity from reasonable regulation imposed in the interest of society. Congress may constitutionally deny the liberty of contract to the extent of forbidding or regulating every contract which is reasonably calculated to affect injuriously the public interests.”
 

 This general and vague statement we interpret as meaning that the Congress is to be the final judge of what is reasonably calculated to affect injuriously the public interests.
 

 The act contains no limitations upon the hours which
 
 *531
 
 an employee may work. There is no limitation upon the right to contract for an all-inclusive regular weekly wage. When appellant offered and appellee accepted the'offer of $31 per week of 78 hours and later $33 for the same 78 hours a week, a contract relationship was established. To follow the administrator’s interpretative bulletin would require the abrogation of that contract by raising appellee’s regular wage not only above the minimum but above what employer and employee had contracted for, and this is not authorized by the act. Had the total pay fallen below the prescribed minimum, the situation would be different.
 

 For our comment upon the reasoning of the courts in the
 
 Bumpus
 
 and
 
 Carleton cases
 
 and the attempt to apply the formula of the administrator’s interpretative bulletin to the facts in this case, we adopt the following language of the Circuit Court of Appeals, Fifth Circuit, in the case of
 
 Fleming
 
 v.
 
 Belo Corp., supra,
 
 to be found at page 211
 
 et seq.:
 

 “If
 
 then, we are, as appellant [appellee here] contends, to find the meaning of the act, its prohibitions and commands, not in the language of its implementing clauses, which the Congress has chosen to express that meaning, but in the general purpose thought to animate it, the title of the act, ‘Fair Labor Standards Act, ’ the complete absence from the act of any prohibition against or limitation upon working extra hours, any prohibition against or limitation upon the making of agreements by employers with their employees, the expressions in Section 2, and particularly the provisions of Section 8, would compel us to conclude that the purpose of the act is to establish and gradually raise minimum wages, that the overtime provisions in it are inserted not at all to discourage or limit overtime work but as a part of the scheme to raise substandard wages by providing a definite pay for overtime work when such work is required; and that noth
 
 *532
 
 ing in it purports to or does at all impair the right of employer and employee to contract as they have done here. When we turn to the legislative history of the act, appellant stands no better. For there is no reference in the whole legislative history to prohibiting agreements between employer and employee, as here, for all inclusive and regular weekly salaries, none whatever to the effect that it was intended that persons already paying more than the minimum wage the act provided should be compelled to pay still more. The legislative history of the act, while showing, as the legislative history of all new and controversial acts does, some individual differences of opinion, adds up to showing, as to the overtime provisions, only what the act shows, that in broad outline the Congress intended that for overtime work, time and a half the regular rate of pay at which each was employed, should be paid each employee. How that regular rate should be arrived at, when it was fixed above the minimum, was not, for all that appears in the briefs of the parties, and we have not otherwise had access to the debates or committee reports, dealt with in the debates on the bill, either in the original passage of it, or in amendments offered to it, except to say that wages above the minimum must be left to bargaining between employee and employer. When all is said and done, appellant [appellee here] comes in his argument to this point: that the law should be construed as he contends for, because in the opinion of the administrator, the law would better serve its purpose if it were drawn that way. Appellant [appellee here] overlooks the fact that a legislative act in the United States is not as in some countries, a mere general outline by a party or group in power, of the purposes it wishes to accomplish, to be expanded, implemented and given effect by its administrators in accordance with the general purposes of its proponents. A fundamental fact in
 
 *533
 
 American political life has always been that in the struggle here for laws as means to make law as liberator effective there have always been differing opinions as to the wisdom, propriety and scope of proposed new and controversial laws and that laws as finally enacted here are usually the result of a compromise or at least of an adjustment of these conflicting views.
 

 “Because this is and always has been so it can be usually said of our laws that the general, not the partial or partisan will, speaks in them. It is because this is so that canons of statutory interpretation and construction require that statutes must be construed and given effect in accordance with the language chosen for the expression of this compromise and adjustment of views, and not in accordance with the purposes or views of either the proponents or the opponents of the legislation which have not been given expression in the statute.
 

 “The issue presented here by the claim of the appellant [appellee here] that though the statute does not say so, it must be construed to give full effect to the purpose of placing him as administrator of the act in a tutelary position, the employer and employee in a state of tutelage to him, so that they no longer have a right to fix their wages by agreement but must fix them according to the legalistic interpretive formulas of the administrator’s general counsel, brings this into sharpest focus. It may be admitted that there is a section of opinion in this country and in the Congress sufficiently collectivistic to prefer the tutelary system for which the administrator contends and that if they had had sufficient voting power, they would have so provided in the law. It must be conceded however on the other hand that there is another section of opinion both in the nation and in the Congress which is not so colleotivistic and still believes in reasonable freedom of contract. It is just because of this fact that legislation is compromise, that the views of the proponents and
 
 *534
 
 of the opponents, as to the purposes and effect of the legislative act, are never regarded as of value in a construction of it, and that it is settled law that statutes must be construed in accordance with the intent of the Legislature as expressed in the language of the act as a whole. Its meaning may not be sought by the courts in the vague penumbrae of the wishes and desires of its proponents or its opponents as these are expressed in debates. Particularly, may it not be sought in the purely legal interpretation by the administrator’s legal staff, for if this were so the administrator would find himself not only in the powerful position he properly stands in, of administrator for the Congress of one of its laws, as plaintiff bringing suit in the name and power of the United States to enforce the law, but, by issuing a binding interpretation of it before he brings his suit, in the position of a judge in his own cause who has written his decision beforehand.
 

 “For us to agree that such interpretations are binding on us would require us to entertain the view the contrary of that uniformly taken both by Congress and the courts that law as well as fact should be and has been delegated to the administrator. The authorities appellant [appellee here] cites in support of his view that the administrator’s interpretation should be followed here, do not, we think, at all support him.”
 

 For the foregoing reasons, the judgment of the Court •of Appeals affirming the judgment of the Court of Common Pleas will be, and hereby is, reversed and judgment rendered for appellant.
 

 Judgment reversed.
 

 Weygandt, C. J., Matthias and Hart, JJ., concur.
 

 Williams and Zimmerman, JJ., concur in paragraph one of the syllabus but dissent from the judgment.
 

 Bettman, J., not participating.