AVEY, APPELLEE, *v.* THE LEATHER PRODUCTS CO. ET AL.,
APPELLEES; THE UNITED STATES OF AMERICA,
APPELLANT.

(No. 6162—Decided December 14, 1942.)

*Mr. Francis A. Hoover* and *Mr. Fred T. Cramer,*
for appellees, receiver for The Leather Products Company.

*Mr. Calvin Crawford* and *Mr. Frederic W. Johnson,*
for appellant, United States of America.

MATTHEWS, P. J.   The only questions presented by
this appeal are: (1) Whether the validity of a provision in a contract made with the United States of
America is to be tested by applying the law of the
state of the forum or by the laws—statutory or nonstatutory—of the United States, and, the controlling
sovereign having been ascertained, and (2) What its
law is on the subject.

The Leather Products Company entered into a contract with the United States on June 10, 1940, to deliver 15,000 pairs of "leggins, canvas, dismounted" to the Philadelphia Quartermaster Department of the War Department, Philadelphia, Pennsylvania, in installments, to be completed by August 11, 1940, for $8,487.83. The contract consisting of the bid with schedules, letter of award, statement and certificate of award was a standard form used by the United States and was eighteen pages in length. This contract is not in the record, but it is agreed that the only provision in dispute is that relating to the rights of the United States arising upon a failure of The Leather Products Company to deliver in accordance with the terms of the contract. That provision is:

"If the contractor refuses or fails to make delivery of the materials or supplies within the time specified, or any extension thereof, the actual damage to the government for the delay will be impossible to determine, and in lieu thereof the contractor shall pay to the government, as fixed, agreed, and liquidated damages for each calendar day of delay in making delivery, a sum equal to one-half of one percentum (½ of 1%) of the price of each unit for each day's delay after the date or dates specified for deliveries and the contractor and his sureties shall be liable for the amount thereof: Provided, however, that the government reserves the right to terminate the right of the contractor to proceed with deliveries or such part or parts thereof as to which there has been delay, and to purchase similar material or supplies in the open market or secure the manufacture and delivery thereof by contract or otherwise, charging against the contractor and his sureties any excess cost occasioned the government thereby; together with liquidated damages accruing until such time as the government may reasonably procure similar material or supplies elsewhere."

The Leather Products Company defaulted completely and on August 12, 1940, the United States terminated the right to make delivery, which it is conceded it had the right to do under the law and the terms of the contract. Thereupon, with due diligence, the United States procured these articles elsewhere at as little cost as possible, but at an increased cost of $630.78 over the contract price. It is also admitted that one-half of one per cent of the contract price for each day of delay in securing the articles made necessary by the default of The Leather Products Company amounts to $1,917.66.

The Leather Products Company's business is in process of liquidation by receivers appointed in this action by the Common Pleas Court of Hamilton county, Ohio. The United States was made a party to this action in the Common Pleas Court and presented both items for allowance by the receivers as valid claims, against The Leather Products Company, entitled to priority of payment from the assets of that company on distribution under the provisions of Title 31, Section 191 of the United States Code. Under the direction of the court, the receivers allowed and paid the item of $630.78, representing the difference between the contract price and the cost price which the United States was obliged to pay, but disallowed the item of one-half of one per cent for each day of delay. It is from the disallowance of this latter item that this appeal was taken.

It is conceded that the contract was within the power of the United States. It is also conceded that the claim for recoverable damage resulting from its breach is entitled to priority under the act of Congress. These concessions, it seems to us, result from a recognition that the United States in making this contract was acting in its sovereign capacity in pursuance of the authority delegated to it in the Constitution and as a

corollary the concession must include the admission that it was acting within the national sphere, notwithstanding its agents were or may have been at the time within the territorial limits of a state. In *Ableman* v. *Booth,* 62 U. S. (21 How.), 506, 16 L. Ed., 169, the Supreme Court said:

"And although the state of Wisconsin is sovereign within its territorial limits to a certain extent, yet that sovereignty is limited and restricted by the Constitution of the United States. And the powers of the general government, and of the state, although both exist and are exercised within the same territorial limits, are yet separate and distinct sovereignties, acting separately and independently of each other, within their respective spheres. And the sphere of action appropriated to the United States is as far beyond the reach of the judicial process issued by a state judge or a state court, as if the line of division was traced by landmarks and monuments visible to the eye."

By Section 8, Article I of the U. S. Constitution, the Congress is empowered to "raise and support" an army and "to provide and maintain" a navy and by the elastic clause in the same section is given power "to make all laws which shall be necessary and proper for carrying into execution" these powers. It, therefore, cannot be doubted that in making this contract the United States was exercising power conferred upon it by the Constitution. Nor can it be doubted that to permit the invalidation of a provision in such a contract by the application of any state law would be a direct interference by the state with the exercise by the United States of power delegated to it.

In *Graves et al., Commrs.,* v. *New York, ex rel. O'Keefe,* 306 U. S., 466, 83 L. Ed., 927, 59 S. Ct., 595, 120 A. L. R., 1466, the Supreme Court in speaking of the nature of action by the United States said: "As

that government derives its authority wholly from powers delegated to it by the Constitution, its every action within its constitutional power is governmental action." The distinction between governmental and proprietary action which is so important in considering municipal action does not exist in the national sphere. And in any view and in any sphere, the purchase of supplies for the military establishment of any government would be governmental action.

We, therefore, conclude that in making this contract the United States was acting in its sovereign capacity in a domain as distinct from any state domain "as if the line of division was traced by landmarks and monuments visible to the eye."

As the transaction took place outside the jurisdiction of the state government neither the validity of the contract nor any provision thereof can be determined or affected by any state law written or unwritten. The validity of the contractual provision here in question must be determined by the applicable laws of the United States, whether that law be in the form of acts of Congress or the pronouncements of courts of the United States.

By nothing we have said do we mean to imply that the United States could not expressly incorporate state law into its contracts, and, perhaps, under certain circumstances, there might be an incorporation by implication, but no such implication can arise to overthrow an express term of the contract which negatives any such intent. Congress has, in certain instances, adopted or incorporated the state law. It did this in the Bankruptcy Act by providing that the bankrupt should be entitled to the exemptions allowed by the law of the state of his residence. But, in such instances, the state law becomes operative in the national sphere.

because of the affirmative act of Congress and not by virtue of the action of the state.

But it is said that *Erie Rd. Co.* v. *Tompkins,* 304 U. S., 64, 82 L. Ed., 1188, 58 S. Ct., 817, 114 A. L. R., 1487, holds that there is no substantive federal common law and that federal courts, when their jurisdiction is invoked because of diversity of citizenship, must enforce the substantive common law of the states as construed by state courts. We believe counsel have missed the import of that case. The Supreme Court was considering there the nonstatutory law applicable to an incident wholly intrastate and, therefore, coming within the reserved power of the states. *Swift* v. *Tyson,* 41 U. S. (16 Pet.), 1, 10 L. Ed., 865, had held that in determining the applicable law to such an incident the federal courts had the authority to decide for themselves what the general nonstatutory law of the state was without reference to what the state courts had determined such law to be. And it was that usurpation of power that the Supreme Court denounced and overruled in *Erie Rd. Co.* v. *Tompkins, supra,* saying: ''We merely declare that in applying the doctrine this court and the lower courts have invaded rights which in our opinion are reserved by the Constitution to the several states.''

It is true that the Supreme Court in the *Erie Rd. Co. case* stated that, ''there is no federal general common law,'' but the limited import is clear from the fact that such statement was made in a diversity of citizenship case and also by this language which immediately followed: ''Congress has no power to declare substantive rules of common law applicable in a state whether they be local in their nature or 'general,' be they commercial law or a part of the law of torts.'' Certainly, in the national domain Congress can and has done all these things.

As *Swift* v. *Tyson, supra,* announced a doctrine that constituted an invasion of the reserved power of the states by the federal judiciary, the doctrine advanced here, if adopted, would constitute an invasion by the state judiciary of the power delegated to the United States and would be a direct interference with the exercise of such power by the United States. That there is no more justification for an invasion of the federal domain by the state judiciary than there is for an invasion of the state domain by the federal judiciary is clear from the authorities.

The decisions of the Supreme Court since *Erie Rd. Co.* v. *Tompkins, supra,* show conclusively that there was no intention to surrender the national domain to the rule of the state of the forum.

In *Royal Indemnity Co.* v. *United States,* 313 U. S.; 289, 85 L. Ed., 1361, 61 S. Ct., 995, the question was as to the measure of damages for breach of a bond taken by a United States collector of internal revenue to secure the payment of a tax. The Supreme Court held, as stated in the syllabus:

"In the absence of an applicable federal statute, it is for the federal courts to determine, according to their own criteria, the appropriate measure of damage, expressed in terms of interest, for delayed payment of a contractual obligation of the United States."

And in *D'Oench, Duhme & Co., Inc.,* v. *Federal Deposit Ins. Corp.,* 315 U. S., 447, 86 L. Ed., 956, 62 S. Ct., 676, the question presented was whether the state law applied to a note taken by the Federal Deposit Insurance Company as collateral to secure a loan made to a state bank. In discussing this subject, Mr. Justice Jackson, in a concurring opinion, at page 468 *et seq.,* said:

"Although by congressional command this case is to be deemed one arising under the laws of the United

States, no federal statute purports to define the corporation's rights as a holder of the note in suit or the liability of the maker thereof. There arises, therefore, the question whether in deciding the case we are bound to apply the law of some particular state or whether, to put it bluntly, we may make our own law from materials found in common-law sources.

"This issue has a long historical background of legal and political controversy as to the place of the common law in federal jurisprudence. As the matter now stands, it seems settled that the federal courts may not resort to the common law to punish crimes not made punishable by act of Congress; and that, apart from special statutory or constitutional provision, they are not bound in other fields by English precedents existing at any particular date. The federal courts have no *general* common law, as in a sense they have no general or comprehensive jurisprudence of any kind, because many subjects of private law which bulk large in the traditional common law are ordinarily within the province of the states and not of the federal government. But this is not to say that wherever we have occasion to decide a federal question which cannot be answered from federal statutes alone we may not resort to all of the source materials of the common law, or that when we have fashioned an answer it does not become a part of the federal nonstatutory or common law.

"I do not understand Justice Brandeis's statement in *Erie Rd. Co.* v. *Tompkins,* 304 U. S., 64 at 78, that 'There is no federal general common law,' to deny that the common law may in proper cases be an aid to, or the basis of, decision of federal questions. In its context it means to me only that federal courts may not apply their own notions of the common law at variance with applicable state decisions except 'where

the constitution, treaties, or statutes of the United States (so) require or provide.' Indeed, in a case decided on the same day as *Erie Rd. Co.* v. *Tompkins,* Justice Brandeis said that 'whether the water of an interstate stream must be apportioned between the two states is a question of "federal common law" upon which neither the statutes nor the decisions of either state can be conclusive.' *Hinderlider* v. *La Plata Co.,* 304 U. S., 92, 110.

"Were we bereft of the common law, our federal system would be impotent. This follows from the recognized futility of attempting all-complete statutory codes, and is apparent from the terms of the Constitution itself."

It is true that most of these cases originated in federal courts, but that cannot limit the consequence of the determination that as to federal subjects there is a great reservoir of common law upon which the courts draw to decide issues not controlled by federal statutes, and that the rules announced in so doing constitute a part of the laws of the United States, no matter what the name may be by which they are designated. Being a part of the federal law, it is the sworn duty of all judges both state and federal to enforce it as a part of their obligation to support and defend the Constitution of the United States under the authority of which such rules of law are promulgated.

Counsel for the receivers oppose to this reasoning the argument that whether the provision is a penalty or one for liquidated damages depends upon interpretation and the application of inferences or presumptions governed by the law of the forum and that this provision would be stigmatized as a penalty under Ohio law and enforcement denied. Assuming such would be its fate if controlled by Ohio law, and aside from the fact that the meaning of the pro-

vision is so clear that no interpretation is necessary or permissible, we do not understand that where constitutional power is involved a state is permitted to restrict federal power and enlarge state power by the simple process of denying the existence of the facts upon which the federal power is based. When the states in the exercise of their reserved powers have strained at the limitation imposed by the due process clause of the 14th Amendment of the U. S. Constitution, the United States Supreme Court has not accepted the state court's findings of fact. *Sterling, Gov.*, v. *Constantin*, 287 U. S., 378, 77 L. Ed., 375, 53 S. Ct., 190.

And where the exercise of reserved power collides with the limitation on such power against its use to . impair the obligation of contracts (Section 10, Article I, U. S. Constitution), the United States Supreme Court protects the contract which it finds to exist, notwithstanding the state may deny its existence, and the state court may have so decided. *Irving Trust Co. et al. Exrs.*, v. *Day, Exr.*, 314 U. S., 556, 86 L. Ed., 452, 62 S. Ct., 398, 137 A. L. R., 1093.

For stronger reasons, a state rule is ineffective to restrict the United States in the exercise of power delegated to it which is declared by the Constitution itself to be the supreme law of the land. On this general subject, see *Richardson* v. *Commr. of Internal Revenue*, 126 F. (2d), 562, 140 A. L. R., 705, and annotation at 717.

However, as already indicated we regard the rule as to penalties as a rule of law, and whether, and to what extent, they will be enforced dependent upon public policy declared by courts, and the Legislature or administrative action based on legislative authority. And in jurisdictions where the distinction depends on whether the circumstances show that the provision was inserted in the contract as the result of a genuine

effort to calculate and make certain the recoverable damage, there is room for resort to inferences and presumptions. But neither the United States nor any state is bound by the common-law measure of damages for breach of contract and either is therefore free to change the rule by enlarging the recoverable damages, and a stipulation in a contract providing for the consequences of a breach must be judged by such new rule. And even under the common-law measure of damages where articles are purchased for a specific purpose to the knowledge of the vendor, the recoverable damages are enlarged by that fact. Therefore, in this case the damages under the common-law rule would include the damages resulting to the public by reason of the army being inadequately equipped. Such damage would be impossible of calculation. The parties would have a right to take that fact into consideration and provide a liquidated sum for the breach.

Now what is the federal rule as to contractural provisions of this sort?

In approaching the answer to this question, it must be borne in mind that we are not presented with an ambiguous or doubtful contractual provision. The language is clear. The damage recoverable is stated in unequivocal terms. In case of default, The Leather Products Company agreed to pay the difference in cost and also one-half of one per cent of the price of each unit for each day of necessary delay in obtaining the goods from other sources by the United States. The provision is not in the alternative. Both are recoverable if the intent as expressed is carried out.

If the provision is to fail it must be because of the impact of some overpowering rule of public policy and this public policy must be a public policy of the United States, and at the threshold of the inquiry we are confronted with an anomaly. It is difficult to see that an act authorized by the United States, as this

provision in the contract was, can be against the public policy of the United States. If the provision had been by express act of Congress, within its constitutional powers, no court could refuse to apply it because of some conflicting view of public policy. Likewise, as in this case, where the provision was inserted by an administrative officer within his authority, it is equally difficult or impossible for the court to denounce it as against public policy. The courts are not the policy-making department of the government.

Many instances could be given of the law-making body authorizing a recovery of a specific sum without reference to any actual damage, and other instances could also be given of such body authorizing the recovery of double or treble the actual damages. Courts have enforced these laws without question. Whether a surety on a bail or recognizance in a criminal prosecution shall pay the entire penalty is subject to the will of the Legislature. The whole doctrine of exemplary or punitive damages is a recognition of the power of the sovereign authority to impose a liability beyond the actual damage. There is no juristic impossibility in incorporating a recoverable penalty in a contract any more than there is in the inclusion of a provision for liquidated damages. The courts may be, and have been, reluctant to enforce penalties where the situation permits the exercise of discretion, but where there is no such liberty, courts should not, and have not, shrunk from enforcing the law.

In the case at bar there is ample basis in fact for holding that the damage to the United States caused by delay in obtaining supplies for the military department is incalculable and therefore the proper subject of contractual stipulation and that the provision in this contract is not disproportionate to conceivable damage. We do not place our decision solely on that

ground, however. The parties, one of which is the United States, have denominated the damage as liquidated damages, and that should end the inquiry. In the "Fair Labor Standards Act of 1938" (52 Stats. at L., 1060, Section 16; Title 29, Section 216, U. S. Code) the employee who was not paid for overtime in accordance with the act was given the right to recover an additional amount, and this amount was denominated "liquidated damages" in the act. In was argued in *Floyd* v. *DuBois Soap Co.,* 139 Ohio St., 520, 41 N. E. (2d), 393, that the state court had no jurisdiction because this was a penalty under another name, to recover which the United States Court is given exclusive jurisdiction by Section 256 of the Judicial Code (Title 28, Section 371, U. S. Code). After discussing the subject and citing authorities, the court said:

"While a court of equity will determine whether an amount denominated liquidated damages in a private contract is in fact a penalty, such interpretation is not permissible where the legislative body has provided that a prescribed or ascertained amount shall be considered liquidated damages to be recovered by a private person."

We see no reason for not applying the same rule to a public contract in which the parties have agreed in unmistakeable terms that the amount should be considered liquidated damages.

Counsel for the receivers rely on certain federal cases which we will notice.

In *Commercial Casualty Ins. Co.* v. *United States,* 83 Ct. Cl., 367, the contract contained alternative provisions on the subject of damages, *i. e.,* to allow the contractor to complete the work and recover the liquidated damages or terminate his right and recover the excess cost. The United States elected in effect to terminate the contract and complete the work itself,

and the court held that it was only entitled to the excess cost. The court construed the provisions of that contract to provide for alternatives and based its decision on its finding in that regard. In the case at bar if the contractual provision were the same, we would reach the same conclusion, but the contract here as clearly provides for both elements of recovery as the contract there provided for a choice between two provisions.

A similar provision for alternative relief was provided in the contract which was construed in *Fidelity & Casualty Co. of New York* v. *United States,* 81 Ct. Cl., 495. There was no provision for cumulative relief before the court.

It is clear that the contract construed in *United States, for benefit of General Lighterage Co.,* v. *Maryland Casualty Co.,* 25 F. Supp., 778, did not provide for the recovery of difference in cost and a per diem for delay.

The latter three cases were cited and the decision predicated upon them in the case of *United States* v. *Cunningham,* 125 F. (2d), 28, and the court expressly placed its ruling in favor of the contractor on the ground that the provision was in the alternative. At page 32 the court said:

"To hold as the government asks us in this case would be not only to disregard the plain, unambiguous language of the government's own contract, but to make a new and different contract for the parties."

The language of the contract in the case at bar as plainly and unambiguously provides for both excess cost and per diem damage. We do not understand that it is claimed otherwise.

We regard such cases as *United States* v. *Bethlehem Steel Co.,* 205 U. S., 105, 51 L. Ed., 731, 27 S. Ct., 450; *Maryland Dredging and Contracting Co.* v. *United*

*States,* 241 U. S., 184, 60 L. Ed., 945, 36 S. Ct., 545; *Wise, Trustee,* v. *United States,* 249 U. S., 361, 63 L. Ed., 647, 39 S. Ct., 303; *Ayres & Graves* v. *United States,* 95 F. (2d), 502, and the other cases cited by the United States as deciding only that a provision for the payment of a certain sum for each day of default in a contract with the United States is a valid provision even though called a penalty in the contract, the court finding in each case that the actual damage that would result to the United States by the delay was uncertain and difficult, if not impossible, of calculation.

That could be said with equal propriety in this case. The difference between the contract price and the excess cost to the United States upon its purchase from another by no means represents the recoverable damages from breach of this contract for supplies for the army, even under the rule of *Hadley* v. *Baxendale,* 9 Exch., 341, 156 Eng. Rep. R., 145, 5 Eng. Rul Cas., 502, in the absence of any stipulation on the subject of damages. Provision for the payment of an item of damage that is subject to mathematical certainty is no reason for denying operation to a provision covering other damage equally real, but which cannot be determined by the application of a mathematical formula.

In none of the cases cited did the Supreme Court of the United States construe the provision to provide for a penalty and then refuse to enforce it. The court has frequently considered the distinction between liquidated damages and penalties in construing language to determine the intent of the parties as to the measure of damage. And in our view that is the only relevancy of the distinction in an action by the United States on a contract providing for the consequences of a breach.

Our conclusion is that the United States has a valid claim for the delay in the sum of $1,917.66, that this

claim is entitled to priority, and that the court erred in disallowing it.

The judgment is reversed and judgment rendered for the United States in the sum of $1,917.66 against the receivers, payable out of the assets in their hands prior and preferable to all other claims.

*Judgment reversed.*

Ross, J., concurs in the syllabus and in the judgment.

Ross, J., concurring. I concur in the conclusion of my associate that the judgment of the Court of Common Pleas must be reversed and judgment here rendered in favor of the United States, payable out of assets in the hands of the receivers.

I concur in this conclusion for the reason that the law of the forum in this case is not radically different from that recognized generally by the weight of authority.

It appears from the record that the sum found to be due as liquidated damages under the contract has a direct relation to the actual damages suffered by the government through the breach of the contract; that actual damages would be difficult to ascertain and uncertain in amount; and that the contract, as far as is shown by the record, is not manifestly unconscionable, unreasonable and disproportionate in amount, and apparently does represent the intention of the parties. Under such circumstances liquidated damages stipulated in the contracts are enforceable. *Mackenzie* v. *Stuber,* 119 Ohio St., 588, 165 N. E., 296; *Jones* v. *Stevens,* 112 Ohio St., 43, 146 N. E., 894; *Miller* v. *Blockberger,* 111 Ohio St., 798, 146 N. E., 206; *Norpac Realty Co.* v. *Schackne,* 107 Ohio St., 425, 140 N. E., 480; *Sheffield-King Milling Co.* v. *Domestic*

*Science Baking Co.,* 95 Ohio St., 180, 115 N. E., 1014; *Doan* v. *Rogan,* 79 Ohio St., 372, 87 N. E., 263; *Knox Rock Blasting Co.* v. *Grafton·Stone Co.,* 64 Ohio St., 361, 367, 368, 60 N. E., 563.

Some early Ohio cases are apparently in conflict with this later well-considered and more reasonable rule. See: *Berry* v. *Wisdom,* 3 Ohio St., 241; *Lange* v. *Werk,* 2 Ohio St., 519; *Nelson* v. *Ford,* 5 Ohio, 473, 474.

The general rule throughout the country is to the same effect as the rule here found applicable. *Kunkel & Jordan* v. *Wherry,* 189 Pa., 198 (the contract in the case here under consideration was to be performed in Pennsylvania); *Dwinel* v. *Brown,* 54 Me., 468; *Leary* v. *Laflin,* 101 Mass., 334; *Guerin* v. *Stacey,* 175 Mass., 595, 56 N. E., 892; *Peabody* v. *Richard Realty Co.,* 125 N. Y. Supp., 349; *Atkyns* v. *Kinnier,* 4 Exch., 776, 783, 154 Eng. Rep. R., 1429.

See, also: 15 American Jurisprudence, 671, Section 240 *et seq.;* 25 Corpus Juris Secundum, 650, Section 101 *et seq.*

Such being the case it becomes unnecessary to determine whether the law of the forum or the law where the contract was entered into applies. In any event, the stipulation is enforceable.

In the construction of contracts entered into by a citizen with the Federal Government the same rules of construction apply that are employed in construing contracts between private citizens. 26 Ruling Case Law, 1437, Section 32.

I am unable to concur in the proposition that the Federal Government, when it enters into a contract with a citizen of a state and participates in litigation involving such contract in a state court, may invoke some nonstatutory rule or law which will exclude the application of the law of the forum or law of the place of performance, as the case may be.