## KEREW v. EMERSON RADIO & PHONOGRAPH CORPORATION.

District Court, S. D. New York.
June 16, 1947.

Sol Dubow, of New York City, for plaintiff.

Laxer, Shapiro & Lauter, of New York City (Jack Laxer, of New York City, of counsel), for defendant.

LEIBELL, District Judge.

The plaintiff has brought this suit under the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., claiming that for a certain number of hours in various weeks from the date of his employment he was paid only straight time instead of time and a half for overtime. The suit is based upon Section 7 and Section 16(b) of the Fair Labor Standards Act.

The defendant has pleaded certain special defenses. He claims that under Section 13 of the Fair Labor Standards Act the plaintiff was in an exempt class and was not covered by the Act; that is, that he was employed in an executive or in an administrative capacity.

As to that defense, as I have already stated during the course of argument, I would dismiss so much of that defense as related to the claim that the plaintiff was employed in an executive capacity.

The defendant also, prior to the actual trial, amended its answer by pleading an additional defense known as a second, separate and distinct defense, in which it alleged "That the acts or omissions complained of, alleged in the complaint, if any, were in good faith in conformity and in reliance on administrative regulation, order, ruling, approval, interpretation, administrative practice or enforcement policy of the Administrator of the Wage and Hour Division of the Department of Labor."

The pleading is set up as a defense under the Portal-to-Portal Act of 1947, which amended Section 16(b). As I stated during the argument of counsel, the proof in respect to that special defense was rather thin. No reference was had with the Administrator of the Wage and Hour Division until some time in March or April of 1944, and that conference apparently was the result of certain complaints that had been made by employees that they were not being paid as they should have been paid under the Fair Labor Standards Act. The plaintiff and the plaintiff's job were not discussed at that conference. So this second special defense of the defendant, based upon the good faith excuse, is dismissed.

Now as to the plaintiff's services: It appears that when he was originally hired on April 6, 1943, there was a written agreement covering his services. He was engaged as an associate engineer; at any rate, that was the title given to him, and the rate of his compensation was fixed in writing at $60 per week. He continued to receive $60 per week until October 4, 1943.

In the period from April 6, 1943, until September of 1943 the plaintiff was engaged in the engineering department, and his work was done under the supervision of Mr. Fogel. The plaintiff's work during that period consisted of building apparatus that was to be used in testing the equipment that was to be manufactured for the Government under the various contracts that Emerson had received from the Government. In performing that work plaintiff worked with his hands. A good part of it was manual, and he was assigned to that work because of his special skill. The plaintiff was a very efficient workman, and he was to a great extent self-educated, especially in this particular field. It seems to me that the services he rendered during that period, while he was engaged in the engineering department working on testing apparatus, were services which are covered by the Fair Labor Standards Act.

Towards the end of September he was transferred to another department, another subdivision of the engineering department, and he worked there until January 1944. The nature of his services in that department was that of a highly skilled mechanic. He helped build pre-production models of certain parts of the equipment that the defendant was supposed to construct under its contracts with the Government. One of these contracts at that time was known as the N. D. N. G. contract, and part of the work of that contract was sublet to two sub-contractors, the International Mutoscope Company and the Lewyte Corporation.

Towards the end of January the nature of the plaintiff's duties changed, and he was then assigned to act as the defendant's representative at the plants of the International Mutoscope Company and the Lewyte Corporation. At about that time, too, his salary was increased from $65 per week to $71 per week, that is, as of the week beginning February 1, 1944. Plaintiff's duties at the end of January 1944, when he began to act as the defendant's representative at International Mutoscope Company and the Lewyte Corporation were to represent the defendant at the plants of these two sub-contractors, to observe the

work that was being done there by the sub-contractors, to make spot tests of equipment in the course of its manufacture in those plants, and also to attend conferences with some of the head men of the department headed by Mr. Dostal. Mr. Dostal was in charge of the sub-contracts. He was manager of government contracts, and he also was the manager in charge of the sub-contract department of the defendant. Mr. Kerew attended conferences with this Mr. Dostal, and also certain other top executives of the firm, and he made suggestions, and his opinion and advice were sought on various problems that arose from time to time in connection with the production work in the plants of these sub-contractors.

As to his authority and his discretion and judgment it appears that he had authority to make minor changes in the construction of the various articles covered by the sub-contracts, but of course any basic change was beyond his authority. Those changes, since this was a Government contract, had to be approved by the representatives of the armed forces for whom this apparatus was being manufactured.

Suggestions of the plaintiff on several occasions resulted in more efficient production. He was a field man of the defendant. Part of his job was to see that production at the plants of these two sub-contractors was maintained at the proper standard required by the specifications, and also that it was continuously performed. In fact there was a schedule that had been set up, that had been referred to as having been fixed for the production of the sub-contractor, and it was the plaintiff's job to see that that schedule was maintained so far as possible.

On occasions the plaintiff assisted in showing the workmen how a repair might be made, and in some instances he made some repairs himself, but his work at these plants was not manual work. It was the work of a supervisor or field inspector. He was a representative of the defendant at those plants.

Later, in connection with another contract that the defendant had with the armed services for the production of what was known as N. Q. equipment, the plaintiff performed similar services at two of the sub-contractors' plants. One of them, I believe, was that of Jabez Burns.

While plaintiff was employed at the plant of the International Mutoscope Company or the Lewyte Corporation, he had a badge which described him as a resident inspector. Apparently this was a badge that the sub-contractor had furnished to him in order that he might be admitted in and about the premises of the plant of the sub-contractor, in view of the fact that the sub-contractor was engaged on war contracts at the time.

Apparently Kerew was the sole Emerson representative at those plants of the sub-contractors. The defendant did have a department known as the field inspection department, and maybe some of those inspectors went there at times, but Kerew was employed by the engineering department and had been loaned to the sub-contract department and was working under Mr. Dostal.

As to the judgment and the discretion reposed in the plaintiff—I am satisfied that he had no authority to make changes in the over-all design, but he could make minor changes and substitutions in the course of construction.

As I have already stated, I am satisfied that the plaintiff was not engaged in an executive capacity. The question remains, however, as to whether or not he was employed and performed services to be classed as the work of an administrative employee, such as is mentioned in Section 13(a) (1) of the Fair Labor Standards Act.

The Administrator, under the Act, has published certain regulations. Among the regulations is one known as Section 541.2, defining the term "administrative employee", or an employee being employed "in a bona fide * * * administrative * * * capacity". The standards set are:

(A) that the employee must be compensated "for his services on a salary or fee basis at a rate of not less than $200 per month (exclusive of board, lodging, or other facilities)", and of course the plain-

tiff met that requirement. I stated in the course of the summation of counsel that I was satisfied that plaintiff's employment was not on a per hour basis; it was on a weekly basis, on a certain fixed salary for a 40-hour week, so he has satisfied that first requirement.

Now in addition, in order to be classed as an administrative employee, he would have to satisfy one of the following four subdivisions that are mentioned in paragraph (B) of Section 541.2 of the Administrator's Regulations. Those subdivisions are:

(1) an employee "who regularly and directly assists an employee employed in a bona fide executive or administrative capacity (as such terms are defined in these regulations), where such assistance is nonmanual in nature and requires the exercise of discretion and independent judgment * * *." I do not think that applies to the work of the plaintiff here.

An employee "(2) who performs only general supervision, responsible nonmanual or field work, directly related to management policies or general business operations, along specialized or technical lines requiring special training, experience, or knowledge, and which requires the exercise of discretion and independent judgment". I think that the plaintiff's services at the plants of these sub-contractors on and after the 1st of February 1944 falls under that subdivision (2) of paragraph (B) of Section 541.2 of the regulations.

Now the third sub-paragraph of (B) refers to an employee "whose work involves the execution under only general supervision of special nonmanual assignments and tasks directly related to management policies or general business operations involving the exercise of discretion and independent judgment".

Subdivision (4) reads: for an employee "who is engaged in transporting goods or passengers for hire and who performs, under only general supervision, responsible outside work of a specialized or technical nature"—well, the fourth, he is not engaged in transportation so he is not of the fourth. That certainly does not cover him.

■ As to the third, whether or not he is an employee "whose work involves the execution under only general supervision of special nonmanual assignments and tasks directly related to management policies or general business operations involving the exercise of discretion and independent judgment", so much of that as would apply to the plaintiff is included in paragraph (2), so I think the plaintiff's work with the sub-contractors should be classified as that of an administrative employee because he satisfies the requirements of Section 541.2, subdivision (A) and subdivision (B) (2), and therefore he is exempt from the Act under Section 13(a) (1) of the Act in so far as the services rendered by him were rendered after February 1, 1944.

In other words, I hold that the services of the plaintiff are covered by the Act for the period prior to February 1, 1944, but that he was exempt under paragraphs (A) and (B) (2) of the regulations in so far as this suit involves services rendered by him after February 1, 1944.

So I intend to enter judgment for the plaintiff for the overtime on which he received only straight time payments for the period from April 6, 1943, to February 1, 1944.

The following calculations which are accepted by defense counsel show the amount due the plaintiff according to the Court's ruling, as follows:

For the period from April 6, 1943, down to the end of September 1943, 142½ hours overtime, which at the half time rate of 75 cents an hour (the full time rate would be $1.50 an hour) would entitle the plaintiff to $106.88.

From October 4, 1943 to February 1, 1944, plaintiff worked 100½ hours overtime, which at the half time rate of 83 cents an hour (the full time rate would be twice that amount) entitles the plaintiff to $83.42; or a total of $190.30.

To this should be added 100 percent liquidated damages. That is another $190.30, making a total of $380.60.

■ The Court will allow as a counsel fee in the case $125. Had the recovery been larger I would have allowed more but I cannot allow more than that on this

recovery. In most cases the allowance is 20 to 25 percent of the total amount of the recovery. This would be about 25 per cent.

Mr. Dubow: I do not want to argue with your Honor on that particular point —as a matter of fact, this is no time for argument, but I do not know that the work, labor and services are necessarily related to the extent of the recovery.

■ The Court: No, but that is what you take into consideration, the amount of the recovery. It isn't merely the extent of the services but the result; if a man came in and sued for a total of $2000 and he recovered $380, you have this allowance. If you had recovered $2000, why the amount that the Court would have allowed you would have been considerably more. We have to keep that as one of the tests, namely, the results obtained. The Circuit Court of Appeals has followed the same rule in making allowances itself when it has reviewed the allowances previously made.

That disposes of the case.

Submit judgment accordingly.

I will now make findings of fact and state conclusions of law.

### Findings of Fact.

1. The plaintiff was hired by the defendant as an associate engineer on or about April 6, 1943, at a salary of $60 a week for a 40-hour week. He continued to receive that salary until October 4, 1943, when his salary was increased to $65 a week for a 40-hour week. His salary remained at $65 a week until February 1, 1944, when it was increased to $71 a week, and he received that salary from February 1, 1944 to July 31, 1944. On July 31, 1944, his salary, was increased to $74 a week, and remained that until August 13, 1945, when his salary was increased to $85 a week, and he resigned a few days thereafter.

2. Plaintiff was employed in the engineering department of the defendant in a subdivision thereof devoted to the construction of testing devices, and he was so employed until the end of September 1943. His services in that time consisted mostly of manual work, in building the various testing devices according to designs and plans prepared by others.

3. At the end of September 1943, about the time that his salary was increased to $65 a week, plaintiff was transferred to another subdivision of the engineering department where he performed mostly manual work in the construction of pre-production models, following plans and designs prepared by others. He continued at that work until the end of January 1944. Beginning with February of 1944 he was loaned to Mr. Dostal's department.

4. Mr. Dostal was manager of the war contracts and manager of production in relation to the work of sub-contractors. Defendant had entered into several subcontracts for the construction of parts which were to be used in the production of what was known as Project N.D.N.G. for one of the branches of the armed services. The International Mutoscope Company was one of these sub-contractors, and the Lewyte Corporation was another of those sub-contractors producing parts for the defendant. The defendant had the main contract with the Government on the N.D.N.G. project.

5. Plaintiff, when assigned to the plants of the sub-contractors, the International Mutoscope Company and the Lewyte Corporation, acted as the representative of the defendant at the plants of those subcontractors. It was part of his work to see that the parts made by the sub-contractor conformed to plans and specifications, and also to see that the production schedules assigned to the sub-contractor were maintained.

In the performance of those duties he would make spot checks of the parts being manufactured by the sub-contractor. In making those spot checks he would use a gauge, but of course he had in mind the requirements of the plans and specifications of that particular part. His work here was nonmanual except in so far as he might have to use a measuring rule or a gauge or testing apparatus from time to time in exercising this supervision of the work of the sub-contractor. There

were a few occasions on which he made repairs to parts.

6. He attended conferences of the top men of the defendant organization, in particular conferences at which Mr. Dostal and Mr. Levy and Mr. Fogel and some of the others were present. At times representatives and officers of the sub-contractors would be asked to attend the conferences. At these conferences the plaintiff would make suggestions and answer questions concerning the progress of the work in the plants of the sub-contractors. In the performance of his work in the field, as a field inspector or engineer of the defendant at these plants of the sub-contractors, the plaintiff would exercise some discretion and independent judgment. As to any basically major changes in the plans and specifications he lacked authority. Any such changes would have to be authorized by plaintiff's superiors in the defendant's organization, and have the approval also of representatives of the armed services.

7. While thus engaged in the plants of the sub-contractors, the plaintiff actually did make some recommendations and approved some slight substitutions which were not of a basic nature and did not require the approval of the armed services.

8. Later on the defendant received a contract for a project known as the N.Q. project, and in that connection sublet some of the work to sub-contractors, including Jabez and Maguire Industries. Plaintiff performed similar services at the plants of those sub-contractors that were similar to those that he had performed at the plants of International Mutoscope Company and the Lewyte Corporation.

9. For the period from April 6, 1943, to the end of September 1943 plaintiff worked 142½ hours overtime, for which he was paid only straight time and not the additional half time required by the statute. During that period he was receiving $60 a week for a 40 hour week, which would amount to a dollar and a half an hour. One-half of that would be 75 cents, so that for 142½ hours there is due him an extra 75 cents an hour or $106.88 for that period.

10. From October 4, 1943 to February 1, 1944, plaintiff worked 100½ hours overtime. During that period he was receiving $65 a week for a 40 hour week. That would amount to $1.65 an hour in calculating the overtime, and since he received only straight time for those overtime hours there is due him an additional half time which at that rate would be 83 cents an hour for 100½ hours, amounting to $83.42.

11. In the performance of his duties, in rendering his services for the defendant in the period between April 6, 1943, and February 1, 1944, the plaintiff was engaged in the production of goods for commerce.

12. The total amount due the plaintiff for overtime is $190.30. He is entitled to an equal amount as liquidated damages, that is to say, another $190.30.

13. A reasonable counsel fee, considering the amount recovered, is $125.

14. In March or April of 1944 the defendant had some conferences with representatives of the Administrator of the Wage and Hour Division of the Department of Labor, concerning the compensation of the defendant's employees. At those conferences neither the plaintiff's name nor the position the plaintiff occupied was discussed.

### Conclusions of Law.

1. The plaintiff is entitled to recover from the defendant for unpaid overtime for the period from April 6, 1943 to February 1, 1944, the sum of $190.30.

2. The plaintiff is entitled to recover from the defendant as liquidated damages an additional sum of $190.30.

3. For overtime in the period subsequent to February 1, 1944, the plaintiff is not entitled to any recovery because during that period he was in the class of an administrative employee and came within the exemption of Section 13 (a) (1) of the Fair Labor Standards Act, and was covered by Regulation 541.2 of the Administrator's Office, in particular para-

graph (B) (2) thereof, which said regulation defines the term "administrative employee."

4. The plaintiff was not employed as an executive employee, that is, in an executive capacity, as that term is defined by the Administrator's regulations.

5. No defense of good faith or other extenuating circumstances has been established by the defendant in connection with the plaintiff's claim for liquidated damages.

6. The special defense pleaded by the defendant that the plaintiff was engaged in an administrative capacity, that he was an administrative employee within the terms of the definition of the regulations is sustained in so far as it relates to the services rendered by the plaintiff subsequent to the period February 1, 1944.

7. The defense based upon good faith, so far as it relates to the claim of the plaintiff to liquidated damages, is dismissed. So much of the plaintiff's claim as is for the period subsequent to February 1, 1944, is also dismissed.

8. A reasonable counsel fee for the plaintiff's attorney is $125 and is allowed, and it may be included in the judgment to be entered herein.

Submit judgment in accordance with the above conclusions of law.

Mr. Dubow: May I note my exception to your Honor's ruling with respect to that portion?

The Court: Yes, but the exception won't be sufficient; you will have to file a notice of appeal.