BURKE et al. v. MESTA MACH. CO.

Civil Action No. 2744.

United States District Court
W. D. Pennsylvania.

July 27, 1948.

592

See also, D.C., 5 F.R.D. 134.

Mortimer B. Wolf, of Witt & Cammer, all of New York City, and Ernest G. Nassar, of Pittsburgh, Pa., for plaintiffs.

John C. Bane, Jr., and John G. Wayman, of Reed, Smith, Shaw & McClay, all of Pittsburgh, Pa., for defendant.

WALLACE S. GOURLEY, District Judge.

This action is brought pursuant to Section 16(b) of the Fair Labor Standards Act of 1938, 52 Stat. 1060, 29 U.S.C.A. § 216(b), and which must be considered in light of the Portal-to-Portal Act of 1947, 61 Stat. 84, 29 U.S.C.A. § 251 et seq. Frank Burke and Napoleon Massa brought the suit as representatives of four hundred fifty-one (451) employees of the defendant.

Plaintiffs seek to recover overtime compensation which it is claimed should have been paid under the provisions of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., an additional equal amount as liquidated damages, a reasonable attorney's fee and the costs of the action, as authorized and required by Section 16(b) of the Act.

After the trial, but before the submission of arguments or any disposition of the case, the Portal-to-Portal Act of 1947 was approved. On June 11, 1947, defendant presented an amendment to its answer, by which it has pleaded the additional defenses permitted by Section 9 and Section 11 of the Portal-to-Portal Act.

The gravamen of the suit is that between the time that the Fair Labor Standards Act became effective on October 25, 1938, and May 1, 1943, defendant did not compensate the employees for overtime hours "at a rate not less than one and one-half times the regular rate at which (they were) employed," as required by Section 7(a) of the Act, 29 U.S.C.A. § 207(a). Instead, defendant paid for statutory overtime hours at one and one-half times the "basic hourly rate" which it established for each employee, which was not the "regular rate" prescribed by the Act.

Incentive bonus earnings were paid to the employees under a long-established

bonus system in the plant whereby employees who performed work in less than a prescribed standard time received as additional compensation pay for one-half of the time saved at the basic hourly rate established by defendant for each employee. Defendant failed to include these incentive earnings in the "regular rate" of the employees and to compute overtime compensation under the Act upon such "regular rate" until May 1, 1943. Instead, defendant paid statutory overtime only on the "basic hourly rate."

The right of any plaintiff to recover, without consideration of the many other involved factual and legal questions which exist, in the first instance must be premised on the fact that each plaintiff was paid an incentive bonus during some pay period in which he had also been allowed overtime hours.

This consideration eliminates from any further part in the case one hundred seventy-six (176) individuals who were listed as plaintiffs in the action. Said plaintiffs received no incentive bonuses in any pay period during which they worked any overtime and, therefore, no error in the defendant's manner of computing overtime upon incentive bonuses could have affected them.

For other reasons, which are not material to the determination of the issues, additional plaintiffs were dropped from the suit.

As a result thereof the list of four hundred fifty-one (451) plaintiffs has been reduced to two hundred fifty-five (255).

The applicable provisions of the Fair Labor Standards Act to be considered in the adjudication of the questions which exist are as follows:

Section 3(b), 29 U.S.C.A. § 203(b)—

" 'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof."

Section 3(i), 29 U.S.C.A. § 203(i)—

" 'Goods' means goods, * * * wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof."

Section 3(j), 29 U.S.C.A. § 203(j)—

" 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purpose of this Act an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State."

Section 7(a), 29 U.S.C.A. § 207(a)—

"No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce—

\* \* \* \* \* \*

"(3) for a workweek longer than forty hours after the expiration of the second year from such date, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

Section 16(b), 29 U.S.C.A. § 216(b)—

"Any employer who violates the provisions of section 6 or section 7 of this Act shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Action to recover such liability may be maintained in any court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated, or such employee or employees may designate an agent or representative to maintain such action for and in behalf of all employees similarly situated. The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."

The applicable provisions of the Portal-to-Portal Act, 61 Stat. 84, 29 U.S.C.A. §

251 et seq., to be considered in the adjudication of the questions which exist are as follows:

Section 9, 29 U.S.C.A. § 258—

"In any action or proceeding commenced prior to or on or after May 14, 1947 based on any act or omission prior to May 14, 1947, no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938, as amended, the Walsh-Nealey Act, or the Bacon-Davis Act, if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any administrative regulation, order, ruling, approval, or interpretation, of any agency of the United States, or any administrative practice or enforcement policy of any such agency with respect to the class of employers to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect."

Section 11, 29 U.S.C.A. § 260—

"In any action commenced prior to or on or after May 14, 1947 to recover unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216(b) of this title."

Defendant is engaged at its plant in West Homestead, Pennsylvania, in the manufacture of steel rolling mill machinery and equipment, including strip mills, cast iron and steel and forged rolls, blooming mills and hot strip mills. It has been engaged continuously in this type of production since 1898, and at all times since October 25, 1938. Its normal products are large machines, custom built for the owners of steel and metal working plants and establishments, commonly costing several million dollars each, and each requiring a year or more of manufacturing and construction work in the defendant's plant; some of the machines of this kind built between 1938 and 1943 were sold for installation within the Commonwealth of Pennsylvania, and others for use in other States.

The production of goods by the defendant for interstate commerce was spread throughout each year, and according to the records of the company during the whole of the period of time involved in this proceeding, part of each day's goods produced would be sent in interstate commerce. During each calendar year between 1938 and 1943 the defendant manufactured and shipped to purchasers outside the Commonwealth of Pennsylvania products of a value of at least $250,000. Subsequent to this country being involved in the Second World War, the defendant had numerous government contracts for the production of materials and other equipment for the war effort. In this connection the materials or goods were sold to the United States Government at the plant where they were produced and the defendant did not actually deliver the goods outside the state of Pennsylvania.

The company normally employs three thousand (3,000) men but during the war the number was expanded to approximately four thousand five hundred (4,500). The company does not maintain any type of separation, in so far as its production activities are concerned, with respect to the production of goods which are destined for shipment outside of Pennsylvania as distinguished from goods which are to be used inside of Pennsylvania. When the employees are working on the product, they do not know whether that product is going to be shipped outside of Pennsylvania, or is going to stay in Pennsylvania, nor are any records kept by the company in this respect.

The company has maintained in effect, pursuant to declarations made in bulletins

posted throughout its plant, a regular work-week of five eight-hour days, beginning at commencement of the first shift, at seven o'clock A.M., on each Monday, and has paid overtime rates for all work done by such employees as the plaintiffs, outside their normal or regular working hours as follows:

1. It has paid a rate of one and one-half times the employee's regular basic hourly rate for all hours over forty worked in any one workweek;

2. It has paid a rate of one and one-half times the employee's regular basic hourly rate for all hours over eight worked on any one day;

3. It has paid at rates double the regular basic hourly rates for all hours worked on Sundays or holidays, except for the period between November, 1942, and December, 1945;

4. Between November, 1942, and December, 1945, it paid at a rate of time and one-half the regular basic hourly rate for all hours worked on New Year's Day, Memorial Day, the Fourth of July, Labor Day, Thanksgiving and Christmas.

The following questions or issues are for determination:

First: Are the employees on behalf of whom the action is brought within the coverage of the Act in that they were engaged in interstate commerce, in the production of goods for such commerce, or in processes or occupations necessary to such production during the periods covered by the complaint?

Second: Was the defendant required to include additional regular incentive bonus earnings which were paid by the defendant to each of the employees in determining the "regular rate" of pay and amount of overtime compensation?

Third: Where the employer fails to include the "incentive bonuses" as aforesaid in its computations of overtime rates and earnings and, in fact, pays overtime compensation substantially in excess of that required by the Act, is the employer entitled to credit said payments against the plaintiff's claims for additional overtime based upon their incentive bonuses?

Fourth: Is the Portal-to-Portal Act of 1947 as it relates to Section 9, 29 U.S. C.A. § 258 (Liability Exoneration), and Section 11, 29 U.S.C.A. § 260 (Liquidated Damages) constitutional?

Fifth: If defendant's failure to consider the incentive bonuses in its computations of overtime compensation were wrong, was the error an intentional and knowing violation of the Act, or was it, on the other hand, done

(a) " * * * in good faith in conformity with and in reliance on any administrative regulation, order, ruling, approval or interpretation, of any agency of the United States, or any administrative practice or enforcement policy of any such agency * * *" within the meaning of Section 9 of the Portal-to-Portal Act, 29 U.S.C.A. § 258, or

(b) " * * * in good faith" and "with reasonable grounds for believing" that it was "not a violation of the Fair Labor Standards Act of 1938 * * *" within the meaning of Section 11 of the Portal-to-Portal Act, 29 U.S.C.A. § 260?

Discussion of Questions or Issues

**1. Production of Goods for Commerce—**

Were the employees engaged in interstate commerce, in the production of goods for such commerce, or in processes or occupations necessary to such production during any of the periods involved herein?

■ The fact that the employer is engaged in the production of goods for commerce does not mean the employees are covered by the Act. Mabee et al. v. White Plains Publishing Co., 327 U.S. 178, 66 S.Ct. 511, 90 L.Ed. 607; Kirschbaum v. Walling, 316 U.S. 517, 524, 62 S.Ct. 1116, 86 L.Ed. 1638; Walling v. Jacksonville Paper Co., 317 U.S. 564, 571, 572, 63 S.Ct. 332, 87 L.Ed. 460; Pentland et al. v. Dravo Corporation, 3 Cir., 152 F.2d 851; Burke v. Mesta Machine Co., D.C., 5 F.R.D. 134.

Section 6(a) of the Act, when read with the definitions of "commerce," "goods," and "produced" in Section 3(b), (i), and (j), requires every employer to pay not less than the required minimum wages to each of his employees who is employed in any process or occupation necessary to the

production, in any State, of any part or ingredient of any articles or subjects of trade, commerce or transportation, of any character, for trade, commerce or transportation among the several States. Roland Electrical Co. v. Walling, 326 U.S. 657, 66 S.Ct. 413, 90 L.Ed. 383.

■ The burden is upon the employee to show that a substantial portion of his time was devoted to work within the protection of the Act. Walling v. Jacksonville Paper Co., supra; Schwarz v. Witwer Grocer Co., 8 Cir., 141 F.2d 341, 343; Noonan v. Fruco Const. Co., 8 Cir., 140 F.2d 633, 634; D. A. Schulte Inc., v. Gangi et al., 328 U.S. 108, 120, 66 S.Ct. 925, 90 L.Ed. 1114, 167 A.L.R. 208; Warren-Bradshaw Drilling Co. v. Hall, 317 U.S. 88, 90, 63 S.Ct. 125, 87 L.Ed. 83; Kelly v. Ford, Bacon & Davis, 3 Cir., 162 F.2d 555, 561; Regulation Wage and Hour Administrator, 12 F.R. 4583, 4584.

■ It is, therefore, the obligation of each plaintiff to establish that he is entitled to the benefits of the Act, and that he has not received them, i. e.:

(a) That the defendant was engaged in the production of materials sold in other states, or engaged in interstate commerce.

(b) That each plaintiff performed work which consisted of the production of goods for interstate commerce.

(c) That while engaged in the performance of work which produced materials used in interstate commerce, said plaintiff has been required to work overtime hours and has been denied his proper overtime pay.

The employees were divided into two classifications:

(a) Those who worked directly in manufacture of the product, and

(b) those whose work materially contributed to production of the products but who did not work directly on the goods.

The work of the latter group of employees was essential and necessary for the production of the company's "goods," including, of course, the unsegregated substantial portion produced for commerce.

■■ The employee is not required to be directly "engaged in commerce" among the several States, or is the employee required to be employed in the production of an article which itself becomes subject to commerce or transportation among several States. It is enough that the employee be employed, for example, in an occupation which is necessary to the production of a part of any other "articles or subjects of commerce of any character" which are produced for trade, commerce or transportation among the several States. An employee is not required to be employed exclusively in the specified occupation nor is it necessary that the occupation in which he is employed be indispensable to the production of goods for interstate commerce. It is enough that the occupation of the employee be "necessary to the production." Even though there may be alternative occupations that could be substituted for it, it is enough that the one at issue is needed in such production and would, if omitted, handicap production. Roland Electrical Co. v. Walling, supra.

■ I believe that the plaintiffs in both classifications have that close and intimate tie to the production of goods for interstate commerce upon which the application of the statute is predicated. There was a substantial and continuous production of goods for commerce with no segregation of intrastate from interstate production. Each employee in this action was necessarily engaged in the production of goods for commerce during each workweek involved herein. Kirschbaum Co. v. Walling, supra, 316 U.S. pages 525, 526, 62 S.Ct. pages 1120, 1121, 86 L.Ed. 1638; Martino v. Michigan Window Cleaning Co., 327 U.S. 173, 66 S.Ct. 379, 90 L.Ed. 603; D. A. Schulte, Inc., v. Gangi, 328 U.S. 108, 119, 66 S.Ct. 925, 90 L.Ed. 1114, 167, A.L.R. 208; Roland Electrical Co. v. Walling, supra; Walling v. Jacksonville Paper Co., supra; Overstreet v. North Shore Corporation, 318 U.S. 125, 128, 63 S.Ct. 494, 87 L.Ed. 656.

■ The question further exists whether the employees were engaged in the production of goods for commerce in view of the fact that between 1941 and 1943 the work of many of the plaintiffs was confined to the production of guns and other vital war materials delivered to the representatives

of the Army or Navy at the plant of the defendant at West Homestead, Pennsylvania.

The question does not appear to have been decided by the Supreme Court of the United States, nor can I find the exact question to have been considered by the Circuit Court of Appeals in the Third Circuit.

The decisions of the district courts and circuit courts of appeal are in conflict as to whether or not the transportation of goods across state lines by the United States to its military facilities which were to be used in the prosecution of the war is commerce, or, on the other hand, an administrative act of the Government.

Such transportation has been held to be interstate commerce and not an administrative act in the following cases: Walling v. Higgins, D.C., 47 F.Supp. 856; Walling v. Kerr, D.C., 47 F.Supp. 852; Clyde v. Broderick, 10 Cir., 144 F.2d 348; Timberlake et al. v. Day & Zimmerman, Inc., D.C., 49 F.Supp. 28; Walling v. Haile Gold Mines, Inc., 4 Cir., 136 F.2d 102; Umthun v. Day & Zimmerman, 235 Iowa 293, 16 N.W.2d 258; Bell et al. v. Porter et al., 7 Cir., 159 F.2d 117; Walling v. Patton-Tulley Transportation Co., 6 Cir., 134 F.2d 945; Divins et al. v. Hazeltine Electronics Corporation, 2 Cir., 163 F.2d 100; Ritch et al. v. Puget Sound Bridge & Dredging, 9 Cir., 156 F.2d 334; St. Johns River Shipbuilding Co., Appellant v. Adams et al., 5 Cir., 164 F.2d 1012; Fox v. Summit King Mines, 9 Cir., 143 F.2d 926, 928; Devine et al. v. Joshua Hendy Corporation, D.C. 77 F.Supp. 893.

Contrary to—Anderson et al. v. Federal Cartridge Corporation, D.C., 72 F.Supp. 644; Barksdale v. Ford, Bacon & Davis, Inc., D.C., 70 F.Supp. 690; Pfoser v. Federal Cartridge Corporation, D.C., 70 F.Supp. 701; Deal & Co. v. Leonard, 210 Ark. 512, 196 S.W.2d 991; Lynch v. Embry-Riddle Co., D.C., 63 F.Supp. 992; Kennedy et al., Appellant, v. Silas Mason Co., Appellee, 5 Cir., 164 F.2d 1016; Brue et al. v. J. Rich Steers, Inc., D.C., 60 F. Supp. 668; St. John's River Shipbuilding Co., Appellant, v. Adams et al., 5 Cir., 164 F.2d 1012.

With due deference to the courts holding to the contrary, although the transportation of some or all of the materials produced by the plaintiffs in the instant case was transported across state lines by the United States to military or naval destinations to be used in the prosecution of the war, I believe such activities constitute commerce within the provisions of the Fair Labor Standards Act, and is not an administrative act of the Government.

To hold to the contrary would in reality mean that the Fair Labor Standards Act would not have had application to any industry which was engaged in the production of goods which were used by the Government in the successful prosecution of the Second World War. In other words, the millions of men and women who contributed so faithfully by the untiring application of their efforts to the manufacture and production of goods, which were necessary for the war effort, would not fall within the provisions of the Fair Labor Standards Act where the goods produced in any instance were transported across state lines from the site of manufacture by any agency of the Government to the site or the location where they were to be used, assigned or distributed to our armed forces. If such had been the intention of congress, I believe the legislative branch of our Government would have so spoken. I believe it would be a strange technical interpretation of the Act to hold employees, under the circumstances which exist in this case, to not be engaged in the production of goods for interstate commerce.

I, therefore, do not stand wrapped in the solitude of my own originality but on the solid ground of the opinions which I have cited, which have construed the production of goods by employees for the war effort to fall within the provisions of the Fair Labor Standards Act. I can see no reason for isolating the employees in the instant case from the general mass of employees in war plants because the goods which they produced were to be used in the prosecution of the war effort, and transported across state lines by representatives of the Government.

## 2. Regular Rate of Pay

Incentive Bonus—

Was the defendant required, in computing the "regular rate" of pay and amount of overtime compensation, to include additional regular incentive bonus earnings which were paid by the defendant to each of the employees?

Defendant's position is that the bonuses "were never part of the 'regular rate' of compensation of any of the plaintiffs," and that the bonus earnings constituted "a gratuity" payment which was not required by any "promise or agreement on the part of defendant," and, therefore, should not be considered in computing the "regular rate" of pay and overtime compensation.

The incentive bonus system of the defendant had been in operation for at least thirty years and is based upon a time estimate for a particular group task. If the task is done in less than the estimated time, the employees participating receive pay for half of the time thus saved at their "basic hourly rate." The employees participate in the compensation for the saved time in proportion to the amount of time they worked on the estimated job, on a prorated basis. At all times since October 25, 1938 it has been defendant's practice to pay the bonus earnings at the first pay day following calculation of those earnings.

The incentive bonus is not based upon the work of any individual employee, but instead upon the success of the group of men who work on a particular productive task or job—for example, the manufacture of a particular machine—to complete it in less than the estimated normal time. The tasks or jobs involved are often large. They are rarely, if ever, completed in one week or one pay-period; and they often call for the work of numerous individuals during thousands of man-hours, spread over months of time. The individual workers do not do their work simultaneously; instead, as in any large undertaking, certain men commence such a task or job, and others take up and complete their parts of the work as the project progresses. The amount of incentive bonus due the group of men involved can be determined only when all the work of all the individuals is done, for it is only at that time that any particular amount can become due any individual; and even then, the bonus is payable not for the efforts of any individual during any particular hour, day or week, but for those of the entire group, during the whole period that the job has been in progress. A particular individual may contribute work to several different incentive jobs during one work-week; he may work on incentive jobs and non-incentive jobs during a single work-week; or he may contribute work to a particular incentive job during parts of several different, and not always consecutive, work-weeks. As result of these characteristics of the company's business and its incentive plan, it is possible to compute overtime rates and upon incentive bonus earnings only by assuming that the aggregate of the incentive earnings paid any individual during some period of employment have been earned at an even rate throughout the period.

Until May of 1943, defendant excluded the incentive bonus earnings in computing the employees "regular rate" for purposes of overtime compensation under the Act. Thereafter defendant changed its practice and included such earnings in the regular rate and has since that time followed the formula established by the Wage and Hour Administration.

The incentive bonus earnings regularly paid to the employees were charged on its records as part of its labor costs. The employees were subject to income and social security taxes on the incentive bonus earnings and defendant withheld such taxes. Prior to the withholding tax, defendant reported bonus earnings as part of the employees' income in the informational statements furnished to them. The company also paid State unemployment insurance taxes and workmen's compensation premiums on the incentive bonus earnings. In none of the foregoing respects did the bonus earnings differ in the slightest from other wages. At no point on defendant's books are these earnings carried as "gifts or gratuities."

The formula for the computation of incentive bonus earnings is fixed in advance, and the employee can calculate his incentive earnings as soon as he has completed a

job. If the employee called defendant's attention to an error made in the calculation of his bonus earnings "it is always corrected"; in no known case has an employee ever been told that since the bonus was a gift or gratuity, no correction would be made. Incentive bonus earnings are received by the employees covered by the plan regularly; it was "rare" that an employee did not receive some incentive earnings during a pay period.

The employee receives a card upon which the time savings and the amount of the bonus are entered. Applicants for employment are informed of the method of payment and the supervisory staff is authorized to explain the method of operation of the incentive bonus plan to the employees.

If an employee beats the time standard "the company owes him half as a bonus." The defendant advised employees that if they completed a job in less than standard time, they would receive the bonus. The intent of the system was that "the company obligates itself and promises to pay to that employee such incentive bonus." For example, if an employee whose "basic hourly rate" was eighty cents an hour participated in a job estimated at fourteen hours but was completed in ten hours, the employee received $1.60 in addition to his other pay, constituting two hours' pay at eighty cents per hour, the other two hours saved was credited to the employer.

The decisive test is whether the bonus "was considered as part of the regular compensation or as a gratuity." Carleton Screw Products Co. v. Fleming, 8 Cir., 126 F.2d 537, certiorari denied 317 U.S. 634, 63 S.Ct. 54, 87 L.Ed. 511. Although defendant might withdraw or amend the incentive bonus plan (as it might accomplish a wage cut in the absence of term contracts) it has so arranged the plan as to cause the employees, with ample justification, to "look forward to and expect to receive the wage premium * * *." Walling v. Garlock Packing Co., 2 Cir., 1947, 159 F.2d 44, 169 A.L.R. 1303. Although "the company was not legally obligated to pay the bonuses [and] the employees knew the payments were not contractual * * *, the undenied, crucial fact here is that in fact they

were regularly paid." Walling v. Richmond Screw Anchor Co., 2 Cir., 154 F.2d 780, 784, certiorari denied 328 U.S. 870, 66 S.Ct. 1383, 90 L.Ed. 1640, expressly approving the administrator's policy of including in the regular rate any bonus which the employer "arranges" to pay, regardless whether he "promises" or "agrees" to do so.

At any given point in time, defendant had no "promise or agreement" to continue the bonus plan for the future. But all payments made to employees under the plan were made as a matter of contractual obligation, consummated when the employee beat the time standard specified on his card. We are concerned here only with the past payments under the plan.

The evidence establishes conclusively that when an employee bettered the time standard established for a job made known to him in advance, he did not receive the resultant incentive earnings as a gratuity. The employees had been aware that the incentive bonus system was a result and important part of their pattern of compensation, yielding regular and substantial returns. Is it possible to say, on this evidence, that if an employee beat the time standard set forth on the card supplied to him by defendant, defendant could nevertheless refuse payment of the incentive earnings on the ground that it had made "no promise or agreement" to pay?

Upon these facts, the question whether or not the incentive bonus earnings had to be included in the "regular rate" is concluded by the decisions of the Supreme Court in Walling v. Harnischfeger Corporation, 325 U.S. 427, 65 S.Ct. 1246, 89 L.Ed. 1711; Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 65 S.Ct. 1242, 89 L.Ed. 1705; Walling v. Helmerich & Payne, 323 U.S. 37, 65 S.Ct. 11, 89 L.Ed. 29; Overnight Motor Transportation Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682.

If the employer pays a bonus without having previously arranged to do so, then it does not count, but it does count if he arranges to grant a bonus with regularity and if the amount thereof may be ascertained by the application of a for-

mula. Walling v. Richmond Screw Anchor Co., 2 Cir., 154 F.2d 780, 785, certiorari denied 328 U.S. 870, 66 S.Ct. 1383, 90 L.Ed. 1640; Walling v. Garlock Packing Co., 2 Cir., 159 F. 2d 44, 169 A.L.R. 1303; Walling v. Harnischfeger, supra; Corey v. Detroit Steel Corporation, D.C., 52 F.Supp. 138, 141; Bass v. Hawley, 5 Cir., 62 F.2d 721; Willkie v. Commissioner, 6 Cir., 127 F.2d 953; Thomas v. Commissioner, 5 Cir., 135 F.2d 378.

 As Congress left the "regular rate" of pay undefined, I feel sure the purpose was to require judicial determination as to whether in fact an employee receives the full statutory excess compensation, rather than to impose a rule that in the absence of fraud or clear evasion employers and employees might fix a regular rate without regard to hours worked or sums actually received as pay.

Due to the manner in which the incentive bonus was earned and the mathematical calculation involved in determining the amount to which each plaintiff was entitled,

the defendant has adopted a formula which met with the approval of the Wage and Hour and Public Contracts Divisions of the United States Department of Labor. This approval was given on May 26, 1943.[1]

It appears that the total incentive bonus for each quarter of a year is divided by the total number of hours worked in said period. This figure will give the earned hourly rate for the quarter period as to the incentive bonuses. The earned hourly rate for the quarter on the incentive bonus is then divided by two and this amount is multiplied by the overtime hours worked in said quarter. This figure will give the additional money due each plaintiff for overtime pay on the incentive bonus.

 It cannot be left to a declaration by the parties as to what is to be treated as the "regular rate" for an employee. It must be drawn from what happens under the employment relationship. I think the most reasonable conclusion is that Congress intended the "regular rate" of pay to be found by dividing the weekly compensation

---

[1] "U. S. Department of Labor
"Wage and Hour Division
"809 Clark Building
"Pittsburgh, Pa.
"May 26, 1943
"Address All Communications To;
"Supervising Inspector
"In Reply Refer To:
"File No. 37-2315
"DFM/rwj
"Mesta Machine Company
"West Homestead, Pennsylvania
"Gentlemen:
"Attention: Mr. R. E. Smith, Jr., Auditor
"I have been given to understand that our Inspector S. Randolph Smith called

at your plant Monday, May 24, and discussed with you the manner in which you might treat the production bonus payments made by the Mesta Machine Company in order to properly reflect the additional compensation in the overtime rate paid to employees of the company for overtime hours worked.
"I submit below the formula which has been approved by the Regional Office and understand that you were given information verbally both by the Regional Director and Inspector Smith that such a formula, when applied, met the requirements of the overtime provisions of the Wage and Hour Law and the Public Contracts Act:

$$\frac{\text{Total Incentive Bonus for Quarter}}{\text{Total Hours Worked in Quarter}} = \text{Earned Hourly Rate for Quarter on Incentive Bonus}$$

$$\frac{\text{E. H. R. for Q. on I. B.}}{2} \times \text{O. T. Hrs. Worked in Quarter} = \text{Additional Money Due for O. T. Pay on Bonus}$$

"This formula is submitted in this form in order that you may have in your records written approval of the Division of the application of the formula which was given to you verbally in the office of the Regional Director and by our Inspector Smith.
"I trust that the payment of the overtime wages due resulting from the payment of the bonus in question will make

the keeping of records and necessary calculations much more simple than would be the case if payments were made on the basis of pay periods as first appeared to be necessary.
"Faithfully yours,
"Stanton W. B. Wood
"Stanton W. B. Wood, Supervising Inspector, Wage and Hour and Public Contracts Divisions"

by the hours worked unless the compensation paid to the employee contains some amount that represents an overtime premium. Bay Ridge Operating Co. v. Aaron (Huron Stevedoring Corporation v. Blue, 334 U.S. 446, 68 S.Ct. 1186; 149 Madison Avenue Corporation v. Asselta, 331 U.S. 199, 67 S.Ct. 1178, 91 L.Ed. 1432, 169 A.L. R. 1293; Overnight Motor Transportation Co. v. Missell, supra; Walling v. Helmerick & Payne, supra; Robertson et al. v. Alaska Juneau Gold Mining Co., 9 Cir. 157 F.2d 876, certiorari denied 331 U.S. 793, 67 S.Ct. 1728, 91 L.Ed. 1821.

The "regular rate" is not the average rate for the first forty hours of work. Walling v. Halliburton Oil Well Cementing Co., 331 U.S. 17, 67 S.Ct. 1056, 91 L.Ed. 1312.

■■ "The regular rate by its very nature must reflect all payments which the parties have agreed shall be received regularly during the workweek, exclusive of overtime payments. It is not an arbitrary label chosen by the parties; it is an actual fact. Once the parties have decided upon the amount of wages and the mode of payment the determination of the regular rate becomes a matter of mathematical computation, the result of which is unaffected by any designation of a contrary 'regular rate' in the wage contracts." Walling v. Youngerman-Reynolds Hardwood Co., supra, 325 U.S. 424, 425, 65 S.Ct. 1245, 89 L.Ed. 1705; The result is an "actual fact." 149 Madison Avenue Corporation v. Asselta, supra, 331 U.S. 204, 67 S.Ct. 1178, 91 L.Ed. 1432, 169 A.L.R. 1293; Bay Ridge Operating Co., Inc., etc., supra.

In Walling v. A. H. Belo Corporation, 316 U.S. 624, 634, 62 S.Ct. 1223, 86 L.Ed. 1716, the Supreme Court refrained from rigidly defining "regular rate" in a guaranteed weekly wage contract that met the statutory requirements of Section 7(a) for minimum compensation. The contract called for a regular or basic rate of pay above the statutory minimum and a guaranteed weekly wage of sixty times that amount. The Court refused to require division of the weekly wage actually paid by the hours actually worked to find the "regular rate" of pay and left its determination to agreement of the parties. Where the

same type of guaranteed weekly wages were involved, the Supreme Court has reaffirmed that decision as *a narrow precedent principally because of public reliance upon and congressional acceptance of the rule there announced.* (Italics supplied.)

As the "regular rate" of pay cannot be left to a declaration by the parties as to what is to be treated as the "regular rate" for an employee, it must be drawn from what happens under the employment contract. The most reasonable conclusion is that Congress intended the "regular rate" of pay to be found by dividing the weekly compensation by the hours worked unless the compensation paid to the employee contains some amount that represents an overtime premium. If such overtime premium is included in the weekly pay check, that must be deducted before the division. This deduction of overtime premium from the pay for the workweek results from the language of the statute. When the statute says that the employee shall receive for his excess hours one and one-half times the regular rate at which he is employed, it is clear to me that Congress intended to exclude overtime premium payments from the computation of the "regular rate" of pay. To permit overtime premium to enter into the computation of the "regular rate" would be to allow overtime premium on overtime premium—a pyramiding that Congress could not have intended. In order to avoid a similar double payment, any overtime premium paid, even if for work during the first forty hours of the workweek or for hours worked over the regular time period in any one day, may be credited against any obligation to pay statutory excess compensation.

■■ The definition of overtime premium thus becomes crucial in determining the "regular rate" of pay. I need not pause to differentiate the situations that have been described by the word "overtime." Sometimes it is used to denote work after regular hours, sometimes work after hours fixed by contract at less than the statutory maximum hours and sometimes hours outside of a specified clock pattern without regard to whether previous work has been done, e. g., work on Sundays or holidays. It is not a word of art. See Premium Pay

602

Provisions in Union Agreement, Monthly Labor Review, United States Department of Labor, October, 1947, Vol. 65, No. 4. It is that extra pay for work because of previous work for a specified number of hours in the workweek or workday. It is extra pay of that kind which Congress intended should be excluded from computation of regular pay. Otherwise the purpose of the statute to require payment to an employee for excess hours is expanded extravagantly by computing "regular rate" of pay upon a payment already made for the same purpose for which Section 7(a) requires extra pay, to wit, extra pay because of excess working hours. Accordingly, excess compensation paid for work in excess of forty hours in one week or in excess of the regular hours in any one day should not be used to figure the "regular rate."

Under the definition, *a mere higher rate paid as a job differential or as a shift differential, or for Sunday or holiday work, is not an overtime premium.* It is immaterial in determining the character of the extra pay that an employee actually has worked at a lower rate earlier in the workweek prior to the receipt of the higher rate. The higher rate must be paid because of the hours previously worked for the extra pay to be an overtime premium.

■■■ I realize the incentive bonus is not based upon the work of any individual employee but instead upon the success of the group of men who work on a particular productive task or job—for example, the manufacture of a particular machine—to complete it in less than the estimated normal time. The tasks or jobs involved are often large. They are rarely, if ever, completed in one week or one pay period; they often call for the work of numerous individuals during thousands of man-hours spread over months of time. The individual workers do not do their work simultaneously; instead, as in any large undertakings, certain men commence such a task or job and others take up and complete other parts of the work as the project progresses. *The amount of the incentive bonus due the men involved can be determined only when all the work of all the individuals is done.*

*For it is only at that time that any particular amount can become due to any individual and even then the bonus is payable not for the efforts of any individual during any particular hour, day or week, but for those of the entire group, during the whole period that the job has been in progress.* A particular individual may contribute work to several incentive jobs during one workweek; he may work on incentive jobs and non-incentive jobs during a single workweek; or he may contribute work to a particular incentive job during parts of several, and not always consecutive workweeks.

It appears, therefore, that as a result of these characteristics of the defendant's business and its incentive bonus plan, it is only possible to compute overtime rates upon incentive bonus earnings by assuming that the aggregate of the incentive bonus earnings paid any individual during some period of employment have been earned at an even rate throughout the period.

If it is not possible to compute the overtime compensation to which the plaintiffs are entitled, with the inclusion of the incentive bonus and consideration being given to the matters referred to in this opinion, that is, dividing the weekly compensation, which is to include the incentive bonus, by the number of hours worked each week, and it is necessary to adjudicate the amounts to which the plaintiffs are entitled to recover on the basis of the formula which has been used, I realize it would be of no avail to direct compliance with the rule enunciated by the Supreme Court. If the respective party litigants through their counsel are able to stipulate relative to the matters just mentioned, appropriate findings of fact and conclusions of law could be entered. If this is not possible, the only alternative is for the court to refer the matter to a Master for the purpose of specific findings of fact relative thereto after which basic facts will exist upon which the Court can give appropriate consideration and enter findings of fact and conclusions of law.

*3. Credits for Payments in Excess of Statutory Requirements—*

Where the employer fails to include the "incentive bonuses" as aforesaid in its

computations of overtime rates and earnings, but, on the other hand, did in fact pay overtime compensation substantially in excess of that required by the Act, should the excess payments actually made be credited against the plaintiffs' claims for additional overtime based upon their incentive bonuses?

Defendant has raised the affirmative defense of payment of all sums due. While admitting that it excluded the bonus earnings from computation of the "regular rate" for overtime purposes, defendant claims it has always paid to every employee a sum at least equal to, and often greater than the amount required to be paid to him as overtime compensation under the Act.

Defendant contends—

(1) It paid to its employees, pursuant to their individual terms of employment, various premiums the Act does not require. These premiums were, principally, double the "basic hourly rate" for Sunday and holiday work and time and a half that rate for hours in excess of eight in any day.

(2) Since the Act required time and a half the "regular rate" for hours in excess of the statutory maximum per week, in some weeks defendant's premiums totaled more than the deficiency in statutory overtime paid just as defendant's "basic hourly rates" were in excess of the minimum hourly rates required by the Act.

(3) Since it has already paid more than the Act's requirements, no deficiency results from the failure to include the incentive bonus in computing the "regular rate."

Defendant seeks to offset such "excess" payments against liability accruing by reason of failure to compute the "regular rate" in a valid way and to pay statutory overtime thereon.

Plaintiffs contend that this defense should be rejected for the reason that if it were allowed, it would be frustrating the Act's purposes for—

(1) The Act required defendant to include the bonus earnings in computing the "regular rate" of pay. Hence, it is apparent that time and a half was not actually paid on the basis contemplated and required by Section 7(a).

(2) The statute requires that the overtime pay be computed in a particular and inflexible way, and the "payment" defense would require the court, after the event, to recompute the compensation paid during each workweek and re-allocate various parts of that compensation to particular hours as if defendant had in fact correctly computed the "regular rate" and observed it in making its payments.

(3) Approval should not be given to agreements or arrangements distributing "excess payments" over straight time and overtime hours in such proportions that the rate for overtime hours will be one and a half times the rate for straight time hours.

I cannot arbitrarily divide bonuses or piece work wages into regular and overtime segments, thereby creating an artificial compliance with Section 7(a). The statement is equally applicable to any request that the Court "arbitrarily divide" excess compensation above the Act's requirements "into regular and overtime segments." Walling v. Harnischfeger Corporation, supra [325 U.S. 427, 65 S.Ct. 1249].

 The Act prescribes an inflexible method for computing the "regular rate" and that sums paid in excess of the Act's requirements could not be arbitrarily reallocated despite failure to observe the prescribed method of computation.

The method of artificial allocation of sums paid in excess of the Act's requirements which defendant proposes here, has been held valid under the Act only in the limited instance where a bona fide contract specifically accomplishes such allocation in advance by specifying a proper "regular rate," and that rate is adhered to for straight time hours and is increased by fifty percent for overtime hours.

Even in this limited circumstance there is considerable doubt that the allocation is any longer valid. If the Supreme Court has not repudiated its holding in the Belo case, it has come so close as to leave no room for its application except on an identical state of facts. As to the Belo case, the Supreme Court has stated "where the same type of guaranteed weekly wages were involved, *we have reaffirmed that decision as a narrow precedent principally because of public reliance upon and con-*

*gressional acceptance of the rule there announced.* (Italics supplied) Floyd v. Du-Bois Soap Co., 139 Ohio St. 520, 41 N.E. 2d 393; Id., 317 U.S. 596, 63 S.Ct. 159, 87 L.Ed. 488; Overnight Motor Transportation Co. v. Missel, supra; Walling v. Youngerman-Reynolds Hardwood Co., supra; Walling v. Halliburton Oil Well Cementing Co., supra; Bay Ridge Operating Co., Inc., etc., supra; Walling v. Uhlmann Grain Co., 7 Cir., 151 F.2d 381.

The extra half time for Sunday work over and above the usual time and a half rate for overtime has exactly the same standing as other premiums above the requirements of the Act which may not be regarded as "payment" of the overtime compensation paid for holidays not worked; compensation paid for a full day's work when only part of it is worked; compensation paid for special work; lump sum bonuses; vacation money, and supper money. See Interpretative Bulletin No. 4, supra, paragraph 70, sub-paragraphs (7), (8) and paragraph 73; W & H Release No. R–1625, Oct. 31, 1941, 2 Labor Law Reporter, Para. 24501.813 to .87; McMillen v. Wilson & Co., 212 Minn. 142, 2 N.W.2d 838 (Setoff of pay for time not worked against overtime liability refused); Hutchinson v. William C. Barry, Inc., D.C.Mass., 50 F.Supp. 292 (counter-claim for pay while absent refused); Walling v. United Distillers Products Corporation, D.C.Conn., 63 F. Supp. 474 (agreement for credit of hours paid but not worked against required overtime held invalid); Black v. Roland Electrical Co., D.C.Md., 68 F.Supp. 117 (offset for yearly bonus disallowed—"the bonus was not paid as overtime compensation."; Bay Ridge Operating Co., Inc., etc., supra.

■ All compensation paid in excess of the Act's requirements cannot be regarded as a cushion which an employer might credit against his obligation to pay time and a half the regular rate for overtime hours. If so, the statutory purpose to spread employment by discouraging overtime hours in any week through imposition of a penalty rate thereon would be frustrated. If all compensation paid in excess of the Act's requirements was to be available as a credit against failure to discharge part of its obligation to pay for overtime hours at one and one-half times the "regular rate," logically it must also be available as a cushion against failure to discharge that obligation in its entirety. It would follow that some statutory overtime hours could be worked without any overtime penalty whatsoever. Overnight Transportation Co. v. Missel, supra.

■ However, any overtime premium paid, even if for work during the first forty hours of the workweek or for work over the regular number of hours in any one day, may be credited against any obligation to pay statutory excess compensation. Furthermore, under the definition of overtime premium a mere higher rate paid as a job differential, or a shift differential, or undesirable hours or disagreeable work, or for Sunday or holiday work, such wage or payment represents additional compensation or higher wages because of the character of work done or the time at which the employee is required to labor. It is not an overtime premium and should be included in the computation for determining the "regular rate" of pay. Bay Ridge Operating Co., Inc., etc., supra.

Each employee, therefore, is entitled to receive compensation for his hours worked in excess of forty at one and a half times his regular rate, which is to include the incentive bonus, computed as the weighted average of the rates worked during the week. Accordingly, statutory excess compensation paid for work in excess of forty hours should not be used to figure the regular rate. Neither should similar contract excess compensation for work because of prior work be used in such a calculation. Extra pay by contract because of longer hours than the standard fixed by the contract for the day or week has the same purpose as statutory excess compensation and must likewise be excluded.

To recapitulate—

(a) Any higher wages or rates paid to any of the plaintiffs in this action which would fall within the definition of "overtime premium" should not be included in computing the "regular rate" of pay.

(b) An employer is not entitled to be credited against any obligation to pay statutory excess compensation for higher wages or rates paid to an employee because of undesirable hours, disagreeable work, job differential, shift differential, or

for Sunday or holiday work for the reason that said payments do not fall within the definition of "overtime premium."

(c) Any overtime premium which has been paid, even for work during the first forty hours of the workweek or for work over the regular number of hours in any one day, should be credited against any obligation to pay statutory excess compensation as provided by the Fair Labor Standards Act.

(d) Where there are any overtime premium payments, the rule for determining the "regular rate" of pay is to divide the wages actually paid and the incentive bonus earned in that week by the hours actually worked in any workweek, and adjudge additional payments to each individual on that basis for time in excess of forty hours worked for a single employer.

The record in this case is indefinite as to the exact amount of wages paid to any of the plaintiffs, exclusive of incentive bonus, which would fall within the definition of overtime premium, undesirable hours, disagreeable work, job differential, shift differential or Sunday or holiday work.

I do not believe it possible to presently adjudicate the amount to which one or more of the plaintiffs may be entitled to recover for the following reasons:

(a) I have no basis to find whether the regular rate has been properly computed, that is,

(1) Were overtime premiums considered in computing the "regular rate"?

(2) Were payments made for undesirable hours, disagreeable work, job differential, shift differential, Sunday or holiday work, included in computing the "regular rate"?

(3) Were incentive bonuses not included in computing the "regular rate"?

(b) I do not know what overtime premiums were paid the plaintiffs, and proper credit cannot be given for said amounts on any amount found to be due any of the plaintiffs under the Act.

(c) The record is not clear as to the amount of credit which has been taken by the defendant for wages or payments made to the plaintiffs for undesirable hours, disagreeable work, job differential, shift differential, Sunday or holiday work.

If the respective party litigants through their counsel are able to stipulate relative to the matters just mentioned, appropriate findings of fact and conclusions of law can be entered. If this is not possible, the only alternative which exists is for the Court to refer the matter to a Master for the purpose of specific findings of fact relative thereto on the basis of the legal principles enunciated herein.

In view of the foregoing and to dispose of all other questions which exist, I will consider the relevant provisions of the Portal-to-Portal Act.

Is the Portal-to-Portal Act unconstitutional?

Plaintiffs question the validity of Sections 9 and 11 of the Portal-to-Portal Act. They contend that the sections violate the United States Constitution because (1) Congress thereby attempted to exercise judicial power in violation of Article III of the United States Constitution, and (2) the sections deprive plaintiffs of their property without due process of law as required by the Fifth Amendment to the Constitution. Plaintiffs also argue that Congress' determination of an emergency cannot justify invasion of plaintiffs' rights here.

The validity of the Portal-to-Portal Act of 1947 under the Federal Constitution has been determined many times on the same grounds urged by plaintiffs here and also on similar ones. For this Court to review all the law on a problem already covered by numerous decisions which it believes correctly states the law is useless. The arguments of plaintiffs have been considered. Sections 9 and 11 of the Portal-to-Portal Act of 1947 are valid; they do not violate the Federal Constitution. Battaglia v. General Motors Corporation, 2 Cir., 169 F.2d 254.

Were the actions of the defendant in failing to consider the "incentive bonuses" in determining the amount of overtime compensation in good faith, in conformity with, and in reliance on any administrative regulation, order, etc.?

Section 9 of the Portal-to-Portal Act provides as follows:

"Reliance on past administrative rulings, etc.—In any action or proceeding commenced prior to or on or after the date of

the enactment of this Act based on any act or omission prior to the date of the enactment of this Act, no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any administrative regulation, order, ruling, approval, or interpretation, of any agency of the United States, or any administrative practice or enforcement policy of any such agency with respect to the class of employers to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect".

In short, under the Portal-to-Portal Act the defendant is not required to show here that its practice between October 24, 1938 and May 1, 1943 was right; and it is not sufficient, on the plaintiffs' side, to convince the Court that the practice was wrong. If the defendant honestly believed that its practice was right, and if its belief was reasonably founded upon the acts and declarations of any administrative agency of the United States, the plaintiffs have no right to recover any amount in this action.

Section 9 requires by its specific terms that defendant must plead and prove that the omission to pay plaintiffs according to the Fair Labor Standards Act was (1) in good faith (2) in conformity with and (3) in reliance upon (4) any administrative regulation, order, ruling, approval or interpretation of any agency of the United States or any administrative practice or enforcement policy of any such agency with respect to the class of employers to which he belonged. Thus, the burden of proof is placed specifically upon defendant, and that burden must be sustained by defendant with respect to each of the four requirements. Jackson v. Northwest Airlines, D.C., 76 F.Supp. 121, at page 125.

The argument advanced by defendant is that it was at all times ready, willing and able to comply with the administrative interpretation of the law, but that it was constantly mislead by inspectors of the Wage and Hour and Public Contracts Divisions of the Department of Labor. These inspectors, according to defendant, persisted in giving defendant the impression that it was within the Act for defendant to exclude incentive bonus earnings from the computation of overtime pay.

The Wage and Hour Division and Public Contracts Division of the Department of Labor were merged in October, 1942 by Executive Order of the Secretary of Labor.

The facts in support of this impression are based on four visits by inspectors of the Wage and Hour and Public Contracts Divisions of the Department of Labor.[2]

It is necessary to note in connection with the letter of the Regional Director that it specifically set forth that the failure to include incentive bonus in computing overtime first came to the attention of said Departmental Agency in the early part of

---

[2] Inspector Dolphin, Representative, Wage and Hour Division, Department of Labor, June, 1940. The inspector reviewed several payrolls, interviewed fifty to sixty employees in the plant and office, took affidavits from said employees concerning said work and whether they received overtime, and furnished forms to the employer to execute, required by the Department, of employees considered to be exempt. After the examination was completed, the inspector called the Auditor of the defendant two days subsequent to the completion of the examination, and said that everything was in order and that he was satisfied with the exception that the records relating to the employees as to the number of hours which were worked should be kept on a week basis rather than a pay period basis.

Inspector Hoffman, Representative, Wage and Hour Division, Department of Labor, March, 1942. The inspector reviewed payroll and other payroll information, interviewed several employees both in the plant and in the office, requested additional information on several people, or changes of employees whom the defendant considered exempt and

1942, and there had been a failure on the part of the Wage and Hour Division and Public Contracts Division of the Department of Labor to properly inform the de-

fendant relative to their responsibility in the matter.

Does the action of one or all of said inspectors constitute an "administrative

questioned the method of computing overtime, that is, not including incentive bonus. The inspector told the Auditor of the defendant that since the Public Contracts Division of the Department of Labor was administering a more stringent law than the Wage and Hour Division, that he would do nothing about the method of computing overtime. No request or order was given the defendant to make any changes or alterations in the method of compliance with the Act. In addition thereto the inspector was informed that the defendant was probably paying more than the Fair Labor Standards Act required even though the incentive bonus was not included in computing the overtime compensation. The inspector was, therefore, fully informed as to the method then used by the defendant in computing the overtime compensation and the failure to include incentive bonuses.

Inspector Stevenson, Representative, Public Contracts Division, Department of Labor, June, 1942. The inspector reviewed the payroll and questioned in detail relating to the method of paying overtime and failure to include incentive bonuses. Said inspector advised the Auditor of the defendant to make no changes unless the inspector so advised. The defendant or its Auditor never heard from Inspector Stevenson.

Inspector Smith, Representative, Wage and Hour and Public Contracts Divisions, Department of Labor, March, 1943. The inspector reviewed payrolls and other data in connection with payroll information. Question was raised as to the method of computing the overtime compensation by not including incentive bonuses. Information was given that the excess overtime paid by the company would probably offset any payments required by the Fair Labor Standards Act. No definite advice was given, one way or another. Subsequent to the investigation just referred to, a letter was received on April 10, 1943, which was dated April 6, 1943, from the Regional Director of the Wage and Hour and

Public Contracts Divisions, Department of Labor, said letter being as follows:

"U. S. Department of Labor
"Wage and Hour Division
"1216 Widener Bldg.
"Philadelphia, Pa.
"April 6, 1943
"Address all communications to:
"Regional Director
"In reply refer to:
"File No. 37–2315
"Mesta Machine Company
"West Homestead, Pa.
"Gentlemen:

"A report recently submitted to this office by an inspector of the United States Department of Labor indicates that there are violations of the Wage-Hour and Public Contracts Acts in the performance of United States contracts as a result of failure to include bonus payments in the calculation of overtime.

"This subject first came to the attention of the Pittsburgh Office of the Wage-Hour Division in the early part of 1942 and on June 5, 1942 Inspector William E. Stevenson of the Division of Public Contracts called at your plant to ascertain the details involved.

"It is our understanding that you were to be informed by the Division's Offices relative to the correctness of the method being used in the calculation of overtime, but we can find no record that such opinion or decision has been rendered up to the present time.

"Both the Fair Labor Standards Act and the Public Contracts Act require the payment of overtime on employees' total earnings including incentive bonuses, production bonuses, etc. Under this statement of fact it appears that a violation has existed which, under normal conditions, would require complete adjustment. In view of the fact that there has been a failure to properly inform you relative to the responsibility in this matter, we shall not seek adjustment for the violation that has existed, but we shall expect compliance with the provisions of the Acts and their regulations from the date on which you receive this communication.

"An acknowledgment from you that you have received this letter is solicited.

"Very truly yours,
"Frank J. G. Dorsey
"Frank J. G. Dorsey, Regional Director, Wage and Hour and Public Contracts Divisions"
"Recd. April 10, 1943

regulation, order, ruling, etc.," within the meaning of Section 9? If so, to what effect was the administrative action?

Certain rules were promulgated by the Wage and Hour Division of the United States Department of Labor in the enforcement of the Fair Labor Standards Act which had application to inspectors. Said inspectors were authorized to examine employers' payroll records in their task of enforcing the Fair Labor Standards Act and were empowered and authorized, among other things, in the following respects:

(a) To give information concerning the Fair Labor Standards Act in the Communities in which they were assigned;

(b) To make inspection of payroll records;

(c) To determine and report whether any employer has violated any provisions of the Act; and

(d) To suggest to the employer, as a means of protection, in addition to the keeping of a payroll, such basic hour records as are recorded by time clocks, or time cards, or sheets which include the exact time of starting and stopping work per day, and of starting and stopping the meal period. Wage and Hour Manual, 1944-1945 Edition p. 929, Bureau of National Affairs, Inc.; Wage and Hour Manual, 1942 Edition p. 704, Bureau of National Affairs, Inc.; Wage and Hour Manual, 1941 Edition p. 81, Bureau of National Affairs, Inc., and Wage and Hour Manual, 1940 Edition p. 40, Bureau of National Affairs, Inc.

The field office of the Wage and Hour Division for the purpose of enforcing the Fair Labor Standards Act to which access was available for the defendant was situate in the City of Pittsburgh, Pennsylvania, and the Regional Office at Philadelphia, Pennsylvania. Wage and Hour Manual, 1943 Edition p. 329, Bureau of National Affairs, Inc.

Interpretations were given by the Administrator in order to assist the divisions of inspectors and attorneys in carrying out their duties intelligently and effectively. Even opinions issued by the administrator were not of 'such legal effectiveness as to finally adjudicate any question which might arise as to the application of the Act.

There were many interpretations issued by the Administrator on the question of including incentive bonus earnings in overtime compensation. Para. 7 of Interpretative Bulletin No. 4 (2 Labor Law Reporter, Para. 32104) was issued in November, 1938. Release R-1548 ( 2 Labor Law Reporter, Para. 24501.819) was issued on September 2, 1941. There are many rulings, orders and interpretations issued by the Administrator which demonstrate that the policy "of the Agency" at all times was that computation of overtime compensation had to include incentive bonus earnings. Throughout these periods the Administrator was instituting enforcement proceedings, such as Walling v. Harnischfeger Corporation, supra, in the District Courts of the United States to challenge the legality of wage practices which differed in no material particulars from those of defendant.

While the term "any agency of the United States" is not defined in the Portal-to-Portal Act, it clearly appears from legislative definition of the term "agency" in other federal statutes and legislative reports. Definition of "federal agency," Federal Register Act, § 4, 44 U.S.C.A. § 304; definition of "agency," Administrative Procedure Act, § 2(a), 5 U.S.C.A. § 1001(a); Senate Document 248, 79th Cong., 2d Sess., 196, 247, 408; U.S.Govt. Manual 1947, 2d Ed., App.A. 628.

It is apparent that Congress was concerned with the dilemma of those employers who sought interpretations of the Act, in accordance with well-established administrative procedures that were open to them; if such an interpretation subsequently proved to be erroneous, the employer faced a considerable liability. Having done all he could to obtain an authoritative statement of his obligations under the Act, the employer could lay justifiable claim to equitable relief. No one in either house of Congress spoke with reference to an employer who sat back for years, while the Administrator issued comprehensive rulings and interpretations to the effect that practices in which the employer was engaging were illegal, and then seized upon an highly equivocal "action" by a Wage and Hour inspector to relieve him of liability. The statute was not couched in terms applicable to such

a case and was not intended to effect such a result.

In order to establish his affirmative defense, the employer must show that the administrative interpretation relied upon was "in fact the interpretation of the agency."

Sections 9 and 11 of the Portal-to-Portal Act were fully discussed on the floors of both Houses, and in the Report of the House Judiciary Committee on H.R.2157 (House Report No. 71, 80th Cong., 1st Sess.), the Report of the Senate Judiciary Committee on H.R.2157 (Senate Report No. 48, 80th Cong., 1st Sess.), and the Conference Report on H.R.2157 (80th Cong., 1st Sess.). Conference Committee Report, Bureau of National Affairs Publication, Washington, D. C., supra c-8; Special Analytical Report, Bureau of National Affairs Publication, Washington, D. C., entitled "The Portal-to-Portal Act of 1947."

Said discussions and resulting debates were prolonged and considerably involved. Reference will be made, however, to some comments in order to illustrate the intention of the legislative body.[3]

The words of Section 9 further strengthen the conclusion drawn from the reports and debates that Congress was referring to rulings by authorized and responsible officials of federal agencies which could be termed rulings of the agency. Not only does the Section refer to "any administrative regulation, order, "etc.," of any agency of the United States," but it also goes on to refer to "any administrative practice or enforcement policy of any such agency with respect to the class of employers to which he belonged."[4]

---

[3] Congressman Gywnne, Chairman of the House Sub-Committee on H.R. 2157, and a leading advocate of restrictive wage and hour legislation, described the purpose of Sections 9 and 11 on the floor of the House as follows:

" * * * The net result has been that many small employers have gone to the persons responsible for enforcing the law, have gotten rulings, interpretative bulletins, and have relied on them, only to find that next year the ruling has been changed by the Administrator or that a court decision has changed it.

"Regardless of his good faith, the employer finds himself subject to suit, not just for the amount involved but for twice the amount involved, together with attorney's fees and costs. This simply provides that the employer in any such case may plead and prove that what he did was done in good faith and in reliance upon administrative rulings or regulations.

"We should bear in mind that this in no way interferes with the right of any administrator to issue rules and regulations and interpretations as provided by law and to change those rules and regulations. All this provides is that the changes will not operate retrospectively." Congressional Record, Feb. 27, 1947, p. 1545).

The entire Congressional debate on the "good faith" defense was cast in terms of general "rulings." Thus, Congressman MacKinnon, a member of the House Labor Committee, in presenting the Conference Report to the House, stated that an employer " * * * cannot be said to have relied in good faith when he

picks one of the rulings on which to rely and, particularly, it seems to me, under the language of the bill, when he relies on the ruling that is most favorable to his, the employer's interest.

\* \* \* \* \* \* \*

"When there are conflicting rules and interpretations by different Government officials, that is exactly the type of case which must be settled in the courts, and Congress should not and does not intend under this bill to attempt to interfere with final court decision on such questions." (Congressional Record, May 1, 1947, p. 4516).

[4] Congressman Walter stated:

"I think I should add to what I said about the defense of good faith. The defense of good faith is intended to apply only where an employer, innocently and to his detriment, followed the law as it was laid down to him by governmental agencies, without notice that such interpretations were claimed to be erroneous or invalid. It is not intended that this defense shall apply where an employer had knowledge of conflicting rules and chose to act in accordance with the one most favorable to him. I say that because there must have been literally thousands of instructions sent by the Army, the Navy, and the Maritime Commission and other governmental officials to employers having Government contracts during the war, that were never issued or confirmed in the usual way, but the employer felt that the person giving those instructions was in a position to speak with authority, and in those classes of cases we hope this measure will provide a defense." (Con-

It seems that Congress acted on the basis of testimony by the Administrator that only he or persons to whom he had specifically delegated the authority to do so were empowered to issue rulings under the Fair Labor Standards Act, and it was with reference to authoritative rulings of this nature that Section 9 speaks. The well settled administrative practice within the Wage and Hour Division is that the Administrator, or a Deputy Administrator (subsequently the Solicitor of Labor) to whom the power has been expressly delegated by the Administrator, could issue Interpretative Bulletins, Opinion Letters, Regulations, Rulings or any other of the multitudinous documents making up the administrative literature under the Fair Labor Standards Act. It was never suggested by anyone in Congress, even the most ardent sponsor of employers' rights, that an inspector did or should have the power to exonerate an employer from compliance with the Act and to deprive his employees of large sums due them as unpaid overtime compensation, particularly in respect to which the Administrator's own pronouncements made it abundantly clear that violations existed.[5]

These words, as used with reference to the Wage and Hour Division, can only refer to the well-established practice of the Wage and Hour Administrator of issuing formal statements as to enforcement policy with respect to particular industries. The qualifications written into Section 9 obviously could have no reference to the case of a Wage and Hour inspector speaking of a particular inspection of a particular employer. What is meant—Are the formal Interpretative Bulletins, Rulings and Opinion Letters issued by the Administrator or his authorized deputies, or similar rulings, etc., issued by any other governmental agency.

In explanation of this clause of the statute, the Bureau of National Affairs publication referred to above states:

"Generally, the enforcement policies issued by the Wage and Hour Administrator list the types of operations affected." B. N.A., Portal to Portal Act of 1947, p. 72.

In further confirmation of the type of administrative rulings referred to is the reference, in the report of the House Judiciary Committee, to the case of Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124.[6]

---

gressional Record, May 1, 1947, p. 4515)

Moreover, there is a statement by Congressman Walter which is very relevant to the question of what constitutes a ruling of the Wage and Hour Division. The following exchange took place between Congressman Celler and Congressman Walter:

Mr. Celler: "Does the gentleman think it fair to have the employer rely upon the administrative ruling or interpretation of law by anyone, say, of the lesser echelons of the Wage and Hour Division, some insignificant servant or employee?"

Mr. Walter: "But the record discloses that the rulings are made by the Administrator—and this is Mr. Walling's testimony—the rulings are either made by him or made by somebody to whom he had delegated the authority to make the rulings. I cannot imagine the important queries we have in mind ever reaching the desk of anyone without the authority to act thereon." (Congressional Record, Feb. 27, 1947, p. 1550)

5 Congressman Barden, one of the most active advocates of restrictive legislation, summarized the effect of Section 9 as follows:

For instance, if the Wage and Hour Administrator, or one of his deputies, issued a ruling or interpretation under the Act, the employer is allowed to proceed under that without being penalized later when they changed their minds.

Congressman Gywnne, Chairman of the House Sub-Committee on H.R. 2157, agreed that Mr. Barden's interpretation was correct. (Congressional Record, Feb. 27, 1947, p. 1545)

Similarly, on the floor of the Senate, Senator Donnell, Chairman of the Senate Sub-Committee on H.R. 2157, explained the purposes of Sections 9 and 11 of the Portal to Portal Act as follows:

" * * * if, after the employer has relied upon the ruling of the very man who is in charge of the administration of the act, it be discovered years later that the Administrator was wrong, or he himself changes his opinion, and the employer is then subjected to liability, it would appear that it would be unjust to subject him to that liability."

6 The Committee stated as follows:

"Congress has the power to provide protection to employers who have complied in good faith with administrative

In the Skidmore case, the Supreme Court described at some length the pattern of administrative interpretation under the Fair Labor Standards Act and the weight to be given to such interpretation. All interpretations, orders and rulings referred to by the Court were those of the Wage and Hour Administrator, or his authorized deputies, whether issued in the form of Interpretative Bulletins, Policy Releases, or Opinion Letters addressed to employers who had applied for such interpretations.

This casting of the debates and the Congressional Reports in terms of agency rulings and agency regulations strongly indicates that Congress had in mind something more formal than the failure of a Wage and Hour Inspector to call an employer's attention to violations. All illustrations and examples given throughout the exhaustive Congressional process involved either formal rulings by an agency of the government, or a statement by a responsible official who was in fact correctly expressing the policy of the agency. None of these requisites are present here.

In his message to Congress approving the Portal-to-Portal Act, the President of the United States said, inter alia:

"I wish also to refer to the so-called 'good faith' provisions of Sections 9 of the Act. It has been said that they make each employer his own judge of whether or not he has been guilty of a violation. It seems to me that this view fails to take into account the safeguards which are contained in this Section. The employer must meet an objective test of actual conformity with an administrative ruling or policy. If the employer avails himself of the defense under this Section, he must bear the burden of proof. He must show that there was affirmative action by an administrative agency and that he relied upon and conformed with such action. He must show further that he acted in good faith in relying upon that administrative action."

The test of good faith is an objective one, and not the actual state of mind of the employer. All of the administrative regulations, orders, rulings, approvals, interpretations and administrative practices or enforcement policies which may furnish the basis for a "good faith" defense must be an affirmative action on the part of the agency. Likewise, an employer's action may not be considered to have been in reliance on an interpretation or ruling unless he actually had knowledge of the ruling or interpretation at the time he acted, and, in fact, relied upon it. Interpretation, Nov. 12, 1947, 16 L.W. 2223.

"Good faith" cannot be established as a simple fact. It is an ultimate fact—a conclusion to be drawn from all the circumstances. Dibins et al. v. Hazeltine Electronics Co., D.C.S.D.N.Y., 79 F.Supp. 513.

An employer may base his "good faith" defense on any written or unwritten ruling or practice of any government agency. The Portal to Portal Act does not contain the definition of "good faith."

It has been held to denote honesty of purpose, the actual existing state of mind, without regard to what it should be from given standards of law or reason. In others, however, it has been defined as honesty of intention, and freedom from knowledge of circumstances which ought to put the defendant on inquiry. Colket v. St. Louis Union Trust Co., 8 Cir., 52 F.2d 390; In re Vater et al., [D.C.], 14 F.Supp. 631; Siano v. Helvering, [D.C.], 13 F.Supp. 776; Reid v. Day & Zimmerman, [D.C.], 73 F. Supp. 892; Jackson v. Northwest Airlines, [D.C.], 76 F.Supp. 121, 126; Gustafson v.

regulation, interpretation, or enforcement practices. (See Graham & Foster v. Goodcell, 282 U.S. 409, 51 S.Ct. 186, 75 L.Ed. 415; Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124) House Report No. 71 on H.R. 2157 (80th Cong., 1st Sess.)"

In its report, supra, the House Judiciary Committee also stated:

"The purpose of this provision (i. e., the good faith defenses) is to protect the employer against the retroactive effect of changes in administrative regulations, etc. It is not limited to regulations of the Wage and Hour Administration. On the contrary, the protection extends to all regulations, etc. of the executive branch of the Government which affect the liability of the employer in the three statutes set out in section 5. Included also is a decision of a court of record to which the employer was a party in interest."

[Fred] Wolferman, Inc., [D.C.], 73 F. Supp. 186; Interpretation Bulletin, Portal to Portal Act, 29 Code Regulations, Chapter V, Part 790, Section 790-19, Issued November, 1947.

It would appear to me that a company of this size would have had in its employ trained counsel or individuals qualified to consider labor relation policies, and to keep informed from day to day as to the various administrative rulings, interpretations, regulations or policies which were promulgated and adopted by the Administrator of the Wage and Hour Division, whose duty it was to administer the Fair Labor Standards Act. Inquiry could have been made to the Administrator and/or the Secretary of Labor as to whether or not any policy, ruling, regulation, or interpretation had been issued which would govern or control, or contain any information as to whether or not the employer in this case was obligated to include the incentive bonus in the computation of overtime payment to be made to the employees.

Although the rulings, interpretations and opinions of the Administrator under the Fair Labor Standards Act do not control judicial decisions, they do constitute a body of experience and informed judgment to which court and litigants may properly resort for guidance. Skidmore v. Swift & Co., supra.

No oral or written approval was given the defendant by any official of any governmental agency that the practice of excluding incentive bonus earnings from the computation of overtime pay was in accordance with the requirements of the Act. At the most, passive or approval by inference of the inspectors who represented the Wage and Hour and Public Contracts Divisions of the Department of Labor existed. Even so, such advice by an inspector, who would be considered in the lowest echelons of the Department of Labor, was inconsistent with the uniform and well-publicized interpretations and ruling made by the Administrator himself and by those responsible officials to whom he had delegated the exacting task of interpretation.

I do not believe that said inspectors had the right to express or give an opinion as to whether or not there was a failure to comply with the Act. This conclusion seems to be exemplified by the letter of the Regional Director to the defendant which was dated April 6, 1943, wherein it is stated, inter alia:

"A report recently submitted to the Regional Director by an inspector indicates there are violations of the Act as a result of the failure to include bonus payments in the calculation of overtime.

"This subject first came to the attention of the Wage-Hour Division in the early part of 1942 and on June 5, 1942 Inspector Stevenson of the Public Contracts Division called at the plant of the defendant.

"*It is our understanding that you were to be informed by the \Division's Offices relative to the correctness of the method used in the calculation of overtime, but we find no record that such opinion or decision having been made.*" (Italics supplied)

There are definite inferences that must be drawn from this letter:

(a) An inspector had no right to give an opinion, one way or the other, relative to the act being violated.

(b) An inspector was to report his findings to the Division Office for evaluation and opinion.

(c) No record of the inspection made in June, 1940 was certified, sent, or filed in either the Pittsburgh Office or the Regional Office of the Wage and Hour Administrator.

(d) The first report of an inspection was submitted in March of 1942 to the Wage and Hour Division of the Department of Labor.

The defense of "good faith" is intended to apply only where an employer innocently and to his detriment followed the advice as it was laid down to him by governmental agencies without notice that such interpretations were claimed to be erroneous or invalid. I do not believe the defendant has satisfied the burden of proof required by the Portal-to-Portal Act.

The defendant is, therefore, not relieved of liability since it has failed to prove the failure to include the incentive bonuses in

computing the overtime compensation in that:

(a) The failure was not in "good faith" in conformity with and in reliance on any administrative regulation, order, ruling, approval or interpretation of any agency of the United States.

(b) The failure was not in "good faith" in conformity with and in reliance on any administrative practice or enforcement policy of any agency of the United States.

Should the Court exercise the discretion granted by Section 11 of the Portal-to-Portal Act as to the entry of liquidated damages?

Section 11 of the Portal-to-Portal Act has relation to this case in an entirely different aspect.

Was the action of the defendant in not including incentive bonuses in determining the "regular rate" of pay in "good faith", and did the employer have reasonable grounds to believe his act or omission was not a violation of the Fair Labor Standards Act?

The defendant claims that at least it comes within the provisions of Section 11 of the Portal-to-Portal Act which has to do with liquidated damages. Here again the defendant has sought to show that it is exempt from liability of liquidated damages by reason of its "good faith." I am satisfied that this "good faith" has reference to something different than the good faith of employers in actually believing that an employee was exempt from the provisions of the Act.

Under the provisions of Section 11 of the Portal-to-Portal Act courts are authorized to award no liquidated damages at all or, in their discretion, any amount up to the present maximum, provided an employer proves to the court's satisfaction:

1. That his violation was committed in good faith, and

2. That the employer had reasonable grounds for believing that his act or omission was not a violation of the Wage and Hour Act.

"Good faith" has been previously defined.

The question then arises as to what sort of circumstances will be construed as giving an employer "reasonable grounds" for believing that no violation existed.

When the old House version was under debate before it was sent to the Conference Committee, Representative Fernandez suggested an amendment which would have substituted the words "with intent to evade the provisions of said acts" for the phrase "without reasonable ground." This amendment was defeated and it was suggested that the substitute phrase was merely another way of expressing "bad faith" which was already in the bill.

One way of showing that there was "reasonable ground" for belief in the lawfullness of a certain action would be for an employer to prove that his conduct was influenced by some authoritative, administrative or judicial ruling in a similar situation.

It is necessary that the person consulted is apparently clothed with the indicia of authority to speak for his employer, in this instance the "agency," then it seems to me that the person who receives his interpretation from such a person ought to have the right to rely on it. Also, if the employer calls some minor official or writes a letter to a minor official, if the minor official has such a right to reply to such letter, it ought not to be construed as "bad faith" to rely on it.

It was suggested by members of Congress opposed to the adoption of the "good faith" defense that an "administrative practice" might be established by the mere failure of the Wage and Hour Administrator to act with respect to a certain class of cases. In the words of Senator McCarran, "this language seems to say to an employer, 'if the other fellows can get away with it, you can get away with it, too.'" To clarify this point, the statement issued by the House conferees in explanation of the conference version of the Portal-to-Portal Act explains that an employer can plead "good faith" reliance on an administrative

614

practice or enforcement policy only under the following conditions:

1. Where such practice or policy was based on the ground that an act or omission was not a violation of the Act.

2. Where a practice or policy of not enforcing the Act with respect to acts or omissions led the employer to believe in "good faith" that such acts or omissions were not violations of the Act.

3. Any administrative ruling issued by any federal agency.

4. Any administrative approval issued by any federal agency.

5. Any administrative interpretation issued by any federal agency.

6. Any administrative practice issued by any federal agency with respect to the class of employers to which the employer belonged.

7. Any enforcement policy issued by any federal agency with respect to the class of employers to which the employer belonged.

In other words, the "good faith" defense in this case need not rest necessarily on a regulation or order issued by the Wage and Hour Administrator or the Secretary of Labor. It can be based on any administrative action of any one of the scores of governmental agencies.

To summarize thus—

During the period involved in this action, to wit, from October 24, 1938 to May 1, 1943, no representative of the United States Government, regardless of the agency, inspected the records of the defendant company relative to compliance with the Fair Labor Standards Act until June of 1940. In June of 1940 an inspector from the Wage and Hour Division of the Department of Labor of the United States Government, who was charged with the enforcement of the Act, did make an investigation. On this occasion defendant was advised that everything was satisfactory except that records should be kept of the hours worked each week by the employees rather than to have the records contain the hours worked each pay period. In March of 1942 an inspector from the same Department, after an investigation, questioned the method of computing overtime,

that is, incentive bonus not being included. However, the inspector further advised that since the Public Contracts Division of the Department of Labor was administering a more stringent enforcement of law than the Wage and Hour Division, nothing would be done about the matter. An additional investigation was made in June of 1942 by an inspector of the Public Contracts Division, Department of Labor. He advised the defendant to make no changes in the method of computing overtime by including the incentive bonus unless information was received from the inspector to said effect. An additional investigation was made in March of 1943 by an inspector of the Wage and Hour and Public Contracts Divisions of the Department of Labor. On April 6, 1943, the Regional Director of the Wage and Hour and Public Contracts Divisions of the Department of Labor, Philadelphia, Pennsylvania, notified the defendant that the company had been violating the Fair Labor Standards Act as a result of the company's failure to include incentive bonus payments in the calculation of overtime wages. The Regional Director further advised that since there had been a failure to properly inform the defendant relative to its responsibility in the matter, no action for the violation of the Act would be instituted but that compliance with the provisions of the Act, by the inclusion of incentive bonus, would be expected from the date of the communication, which was April 6, 1943.

I can find no basis in the record to reach the conclusion that the defendant acted in "good faith" and had reasonable grounds to believe the failure to include the incentive bonus in determining the overtime pay was not a violation of the Act prior to June of 1940. However, commencing in June of 1940 an investigation was made by representatives of either the Wage and Hour Division or Public Contracts Division of the Department of Labor, and it was not until April 6, 1943 that the defendant was advised by the Regional Director that the failure to include the incentive bonus was a violation of the Act.

Were the actions of the inspectors subsequent to June of 1940 sufficient to establish the "good faith" required and give the

defendant reasonable grounds to believe it was not violating the Act between June 15, 1940 (no date in June was given so I have taken the medium of the 15th), and May, 1, 1943?

It is a settled principle of law that where a person deals with an agent, it is the duty of said person to ascertain the agent's authority. The burden is on the party relying on the acts of the agent to establish the Act, upon which reliance is placed, and that the act upon which he relies was within the agent's authority. An agency is a warning to one dealing with said person, that he does so at his peril, whether the agent has the authority which he assumes. Ferro Concrete Construction Co. v. United States et al., 1 Cir., 112 F.2d 488, certiorari denied 311 U.S. 697, 61 S. Ct. 136, 85 L.Ed. 452; 54 Fed.Dig., Principal and Agent ⊗⟶147(2).

The statements of the inspectors that no change need be made, or their passive actions of saying or doing nothing relative to the method used by the defendant, to compute overtime compensation, at first impression, indicates the defendant acted in "good faith" and reasonable ground existed to believe no violation existed. This impression is met by the consistent and repeated interpretations issued by the Administrator to the effect that computation of overtime had to include incentive bonus earnings.

Under any stretch of imagination I cannot bring my mind to the conclusion that the defendant had such reasonable ground to believe it was doing right and that "good faith" existed, such as would exonerate the defendant from any liability for liquidated damages. The plaintiffs are, therefore, entitled to liquidated damages in an amount equivalent to that which is found to be due for overtime compensation for the period from October 24, 1938 to June 15, 1940.

However, I believe some reasonable ground existed to so believe, and, in the exercise of the discretion imposed by Section 11 of the Portal-to-Portal Act, for the period between June 15, 1940, and May 1, 1943, liquidated damages will be imposed in an amount equivalent to fifty percent of the amount which it is subsequently determined the plaintiffs are entitled to recover for overtime compensation.

The question then arises as to the amount of attorneys' fees to which counsel for the plaintiffs are entitled. This determination is attended with some difficulties. The case has required a great deal of time and research, and in addition to the services performed which I believe should be considered, the amount of recovery must also be evaluated. Kerew v. Emerson Radio and Phonograph, D.C., 76 F.Supp. 197; Baker et al. v. California Shipbuilding Corporation, D.C., 73 F.Supp. 322.

The only fees to which the attorneys for the plaintiff are entitled will be a reasonable fee awarded by the Court. Any agreement between the plaintiffs and their counsel for an additional fee on a contingent basis, or any other understanding, would be contrary to the purpose of Congress to have the employee collect and return unpaid wages and liquidated damages. Harrington, Appellant, v. Empire Construction Co., 4 Cir., 167 F.2d 389; Skidmore et al. v. John J. Casale, Inc., 2 Cir., 160 F.2d 527; Aucoin v. Mystic Waste Co., D.C., 55 F.Supp. 672; Hutchinson v. William C. Barry, D.C., 50 F.Supp. 292.

The entry of an amount of attorneys' fees will, therefore, be deferred until disposition is made of the various questions which I have heretofore stated.

Judgment for entry of costs will also be deferred for the same reason.

Counsel are directed to collaborate and endeavor to prepare appropriate findings of fact, conclusions of law, and judgment in accordance with and in conformity to the views expressed in the foregoing conclusions of the Court on or before September 15, 1948. If this is not possible, the matter will be referred to a Master on September 15, 1948, for the purpose of determining the questions which exist as to the amount of liability.